# Exhibit 5

Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4

 5   REGINALD HARDAMAN,        )

 6   (#M550-50)                )

 7            Plaintiff,    )

 8       vs.                   )  Case No. 1:17-CV-02818

 9   ANDRE S. MILES,           )

10   MICHAEL L. WILLIAMS,      )

11            Defendants.   )

12

13            The deposition of ANDRE MILES, SR.,

14   called by the Plaintiff for examination, taken

15   pursuant to the Federal Rules of Civil Procedure of

16   the United States District Courts pertaining to the

17   taking of depositions, taken before JOANNE H.

18   RICHTER, a Certified Shorthand Reporter of

19   Illinois, No. 84-2082, at Suite 2100, Law Offices

20   of Fitch, Even, Tabin & Flannery, LLP, 120 South

21   LaSalle Street, Chicago, Illinois, on the 31st day

22   of August, A.D. 2018, at 9:08 a.m.

23

24

ANDRE MILES                                          August 31, 2018

Page 2

```
 1   PRESENT:

 2

 3         FITCH EVEN TABIN & FLANNERY, LLP

 4         (120 South LaSalle Street, Suite 2100

 5         Chicago, Illinois  60603-3402

 6         312.577.7000), by:

 7         MR. ANDREW C. WOOD,

 8         awood@fitcheven.com,

 9             appeared on behalf of the Plaintiff;

10

11         OFFICE OF THE ATTORNEY GENERAL -

12         STATE OF ILLINOIS -

13         ATTORNEY GENERAL LISA MADIGAN

14         (100 West Randolph Street,

15         Chicago, Illinois  60601

16         312.814.4659), by:

17         MR. ANDREW O'DONNELL,

18         aodonnell@atgstate.il.us.

19             appeared on behalf of the Defendants.

20

21

22

23   REPORTED BY:  JOANNE H. RICHTER,

24                    C.S.R. No. 84-2082.
```

Page 3

1              (WHEREUPON, the witness was duly

2              sworn.)

3                 ANDRES MILES, SR.,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                      EXAMINATION

7    BY MR. WOOD:

8         Q.    Good morning, Mr. Miles.

9         A.    Morning, sir.

10        Q.    Will you please state your name and

11   spell it for the record.

12        A.    Yes, sir.  Andre Miles, Sr.

13   Andre, A-n-d-r-e, Miles, M-i-l-e-s, Sr.

14        Q.    Have you given deposition testimony or

15   testimony in court before?

16        A.    Yes, sir.

17        Q.    You do understand that I am going to ask

18   you questions that I need you to provide a verbal

19   answer to?

20        A.    Yes, sir.

21        Q.    Because the court reporter won't be able

22   to pick up a nod of the head or a shake of the head

23   or things of that nature.

24        A.    Yes, sir, that is correct.

ANDRE MILES                                              August 31, 2018

Page 4

```
 1        Q.     Okay.  So Mr. Miles, how old are you?

 2        A.     46 years of age, sir.

 3        Q.     And what's your date of birth?

 4        A.     Date of birth is April 22nd, 1972.

 5        Q.     What is your current address?

 6        A.     Current address is 900 Meadows Edge

 7    Lane, Joliet, Illinois, 60436.

 8        Q.     How long have you been there?

 9        A.     I have been there from June of 2001.

10        Q.     Okay.  And where did you live prior to

11    that?

12        A.     I resided at 334 West 92nd Street,

13    Chicago, Illinois.

14        Q.     How long were you at that place of

15    residence?

16        A.     Approximately a year and a half.

17        Q.     Do you remember where you were before

18    that?

19        A.     Before that, I lived in Joliet,

20    Illinois, 2214 South Bogdan, Joliet, Illinois.

21        Q.     How long were you there?

22        A.     Two years.

23        Q.     What is your highest level of education

24    completed?
```

ANDRE MILES                                              August 31, 2018

Page 5

 1      A.    College courses.

 2      Q.    Go ahead.

 3      A.    Just a couple of courses in college.

 4      Q.    Where did you attend college?

 5      A.    Joliet Junior College.

 6      Q.    What was the curriculum that you studied

 7  while you were there?

 8      A.    Criminal justice.

 9      Q.    And then let's go through your

10  employment history.  So what is your current

11  position?

12      A.    Correctional officer.

13      Q.    Who is your employer?

14      A.    Stateville Correctional Center, Illinois

15  Department of Corrections.

16      Q.    How long have you been a correctional

17  officer for?

18      A.    April 1st of 1996.

19      Q.    And where were you employed prior to

20  that?

21      A.    Prior to that, I had various jobs.

22  I was in the military prior to that.

23      Q.    Which branch?

24      A.    Marine Corps.

ANDRE MILES                                                    August 31, 2018

Page 6

```
 1          Q.     And how long were you in the Marine
 2   Corps for?
 3          A.     Four years.
 4          Q.     Four years?
 5          A.     Yes, sir.
 6          Q.     Did you do that right out of college?
 7          A.     Right out of high school.
 8          Q.     Right out of high school?
 9          A.     Yes, sir.
10          Q.     Okay.  Mr. Miles, have you ever been
11   convicted of a crime or arrested for any reason?
12          A.     No, sir.
13          Q.     Have you ever had a civil lawsuit filed
14   against you prior to this one?
15          A.     Civil --
16          Q.     Has anyone ever sued you?
17          A.     Yes, sir.
18          Q.     So what have you been sued for before?
19          A.     Other allegations from inmates while
20   working at the Stateville Correctional Center.
21   Basically, that's it.
22          Q.     Okay.  Can you give me an estimate or
23   even an exact number of how many such claims have
24   been filed against you?
```

ANDRE MILES                                                    August 31, 2018

Page 7

```
 1        A.    Over the last 22 years?

 2        Q.    Uh-hum.

 3        A.    Of allegations, maybe 10.

 4        Q.    10?

 5        A.    Yes, sir.

 6        Q.    Okay.  And then have you ever sued

 7   anyone?

 8        A.    No, sir.

 9        Q.    Let's go back to those claims filed

10   against you real quick.

11              What have been the substance of those

12   claims, generally speaking?  What have the inmates

13   alleged against you?

14        A.    Force.

15        Q.    Excessive force?

16        A.    Yes.

17        Q.    Could you give me an example?

18        A.    Give you an example of --

19        Q.    Of what they have alleged?

20        A.    Excessive force was used after they had

21   committed an infraction while in the penal

22   institution.

23        Q.    So could you provide me the

24   circumstances of any one of such incidents just as
```

ANDRE MILES                                                    August 31, 2018

1    an example?

2         A.    Inmate attacked staff and we took inmate

3    down to the ground to subdue him and he said we

4    used too much force.

5         Q.    And then can you recall any other type

6    of claim asserted against you beyond excessive

7    force?

8         A.    No, sir.

9         Q.    Did you have any positions for the

10   Illinois Department of Corrections prior to

11   beginning your position as a corrections officer?

12        A.    No, sir.

13        Q.    Have you ever been stationed at any of

14   the other Illinois Department of Corrections

15   facilities?

16        A.    No, sir, Stateville.

17        Q.    Stateville since --

18        A.    1996.

19        Q.    So how did you go about getting a job at

20   Stateville Correctional Center?

21        A.    I applied on the IDOC website.  I took a

22   physical agility test, a reading test, and

23   background check, and I was employed after that.

24        Q.    Did you undergo any type of training or

Page 9

```
 1    orientation through the Illinois Department of

 2    Corrections?

 3         A.    Yes, sir, the academy.

 4         Q.    The academy?

 5         A.    Yes, sir.

 6         Q.    And what type of training and/or

 7    orientation did you receive while you were at the

 8    academy?

 9         A.    In the academy, they taught us rules,

10    regulations, policies and procedures, range, those

11    are types of training we received in the academy.

12         Q.    Was there any classroom training while

13    at the academy?

14         A.    Yes, sir.

15         Q.    What was this classroom training?  Do

16    you remember the curriculum that you were taught?

17         A.    No, sir.  It has been over 22 years.

18    I can't recall the exact curriculum, but they just

19    told us the policies and procedures of the Illinois

20    Department of Corrections.

21         Q.    Did you have a regular schedule for an

22    amount of time that you would spend in the

23    classroom?  For instance, would you have a certain

24    amount of time that would be spent in the classroom
```

Page 10

1   every day, Monday through Friday, or --

2         A.    I was in the academy for eight weeks,

3   Monday through Friday.  On weekends, we came back

4   home.  So I was in class Monday through Friday,

5   approximately 8 a.m. until we got done, 5 p.m.

6         Q.    So would you go in the class at 8 a.m.

7   and be in the classroom until 5 p.m., or would you

8   have a certain amount of time that would be spent

9   in the classroom and then would you go to field

10  training or --

11        A.    It depends on what we were doing.  When

12  we had range training, "range" being firearms

13  training, we was not in the classroom.  We was

14  physically out on the range for a week.

15        Q.    Okay.  Did you receive any written

16  materials during your time while in the classroom?

17        A.    I believe so, yes.

18        Q.    Were these like a textbook or paper

19  handouts?

20        A.    I believe paper handouts.

21        Q.    Paper handouts?

22        A.    Yes, sir.

23        Q.    Do you remember the substance of any of

24  these materials?

ANDRE MILES                                                     August 31, 2018

Page 11

```
 1        A.      Not offhand, sir, no.

 2        Q.      Okay.  Did you keep any of these

 3   materials?

 4        A.      No, sir.

 5        Q.      So they made you keep them at the

 6   academy?

 7        A.      Yes, sir.

 8        Q.      Where was the academy?

 9        A.      Springfield, Illinois, Illinois

10   Department of Corrections Academy.

11        Q.      Then you said that it was eight weeks of

12   academy training, yes?

13        A.      Yes, sir, that is correct.

14        Q.      And then about how long was it in

15   between when you completed your academy training

16   and when you were placed at Stateville?

17        A.      After the eight weeks, on that Friday we

18   graduated and reported to work Monday morning, sir.

19        Q.      Did you begin your position immediately

20   on that Monday, or did you begin to undergo some

21   type of training or orientation when you first got

22   to Stateville?

23        A.      We went to orientation.

24        Q.      Do you remember what type of training
```

ANDRE MILES                                                    August 31, 2018

Page 12

1    orientation?  For instance, was there also a

2    physical and classroom component of it at

3    Stateville, or was it merely classroom component?

4          A.     Just classroom, sir.

5          Q.     And what were you taught in the

6    Stateville orientation or training?

7          A.     Basically, it was they taught us the

8    location of the different units.  They taught us

9    about key control and basic knowledge of being a

10   correctional officer, sir.

11         Q.     So that would include the rules and

12   policies of Stateville Correctional Center?

13         A.     Yes, sir, that is correct.

14         Q.     So did your training and orientation

15   provide instructions on a procedure to follow when

16   a corrections officer receives a request for

17   medical attention from an inmate?

18         A.     Yes, sir.

19         Q.     Would you please describe that procedure

20   to me?

21         A.     Can you repeat that question, please.

22         Q.     Absolutely.  So what did they teach you

23   to do when an inmate reports to you that he is sick

24   or otherwise feeling ill?

Page 13

1      A.      How is he reporting this to me, sir?

2      Q.      Just somehow using an emergency call

3   button, getting your attention, or just in any way

4   communicating to you that he is feeling sick or

5   ill.

6      A.      So that was a three-part question.  I am

7   going to answer them one at a time.

8      Q.      Sure.

9      A.      You said regarding an emergency call

10   button.  I, as a correctional officer, is not privy

11   to emergency call buttons.  Emergency call button

12   go from inmate cell to the main control.  Main

13   control is, I would say, as the headquarters of the

14   facility.

15           So if inmate pushed emergency call

16   button, that button is in the inmate cell and it

17   will go to other individuals.

18           The next part of that question you asked

19   me regarding if he verbally tell me, if he verbally

20   tells me, I will pass that information on to the

21   medical staff.  Did you ask me about a written

22   policy, as well?

23      Q.      Just, really, I want to know, just what

24   procedure you are to follow if he in any way gets

 1    your attention and reports to you that he is sick.

 2         A.    If he gives me a sick call request slip,

 3    I will pass that onto the medical personnel.  In

 4    the cell house, there is a medical envelope.

 5    I will place the paperwork inside the envelope and

 6    the medical staff will take it from there.

 7         Q.    So you are indicating that there are two

 8    ways to handle this policy, and one is to inform

 9    the medical staff verbally, is that correct?  There

10    is one way that you can are report it verbally?

11         A.    Yes, sir.

12         Q.    And then a second way in which you can

13    just give them the sick call request slip and then

14    submit that?

15         A.    If the inmate give me a sick call

16    request slip.

17         Q.    So this is materials that are kept in

18    their cell?

19         A.    They get sick call slips from the

20    medical personnel when they make their rounds.

21              The medical personnel makes their rounds

22    three times a day on every shift.  First shift

23    being 7 to 3, second shift being 3 to 11, and the

24    third shift being 11 p.m. to 7 a.m.  Medical staff

Page 15

1   make their rounds to all these cell house units.

2        Q.    Okay.  So do they walk around and just

3   offer the inmate a sick call slip request if they

4   request to get such form?

5        A.    Medical personnel walks around and pass

6   out inmate medication.  They give them the insulin

7   shots, any medical condition inmates may need.

8   That's what the medical personnel does.  So they

9   make their rounds to pass out those different

10  items.

11       Q.    So in your 22 years, you have obtained

12  medical attention for an inmate at Stateville

13  before, correct?

14       A.    Yes, sir.

15       Q.    And you have done so both by offering

16  verbal communications to the medical personnel?

17       A.    Yes, sir.

18       Q.    As well as submitting the sick call slip

19  request in the envelope as you indicated?

20       A.    That is correct, sir.

21       Q.    Have you heard of inmates getting sick

22  from the food at Stateville before?

23       A.    Have I heard?  I really don't work

24  inside the institution, so I really don't -- can't

Page 16

1    answer that question, sir.

2         Q.    Has an inmate ever complained of the

3    food making him sick to you?

4         A.    Inmates complain about everything, sir,

5    while they are incarcerated.

6         Q.    But can you recall specifically an

7    instance where they say, "This food has made me

8    sick," or something to that effect?

9         A.    They say, "We hate this food.  It is

10   garbage.  I wouldn't feed my dog this."

11        Q.    So are you aware that this lawsuit is

12   concerning a former inmate's complaint that he ate

13   food and got sick from it?

14        A.    They have brought me up to the speed and

15   informed me of that, yes, sir.

16        Q.    And you are aware of his allegations

17   that you and Office Williams ignored his sickness

18   and requests for medical attention?

19        A.    I was informed that by my counsel.  And

20   I don't know Office Williams personally, sir.

21        Q.    You did know him personally or --

22        A.    I did not know Office Williams.

23        Q.    So he, Mr. Miles, in your time at

24   Stateville you indicated that -- strike that,

ANDRE MILES                                          August 31, 2018

Page 17

1    please.

2              Mr. Miles, you indicated that there are

3    several wings and units at Stateville, correct?

4         A.    Yes, sir.

5         Q.    Which wings and units have you been

6    stationed at during your time at Stateville?

7         A.    Over the last 22 years?

8         Q.    Yes.

9         A.    I have worked every assignment in the

10   facility.

11        Q.    Every assignment in the facility?

12        A.    Yes, sir, but my main assignment is

13   transportation.

14        Q.    Transportation?

15        A.    Yes, sir.

16        Q.    Were you ever stationed in -- strike

17   that.  So it is safe to say you have been stationed

18   in the D & E wing of Stateville before?

19        A.    Yes, sir.

20        THE COURT REPORTER:  Please repeat the wing.

21        MR. WOOD:  D & E.

22        THE WITNESS:  "D" as in Delta, "E" as in

23   Edward.

24

ANDRE MILES                                                    August 31, 2018

Page 18

1    BY MR. WOOD:

2         Q.    So in your 22 years at Stateville, have

3    you received any type of continuing education,

4    continued training?

5         A.    No, sir.  Sorry, just annual cycle

6    training.  Every year you are required to have

7    annual cycle training.  I do that yearly.

8         Q.    So what does this cycle training consist

9    of?

10        A.    Cycle training consists of first aid,

11   CPR, AD's and ID's, range, chemical agents type of

12   training.

13        Q.    Would it be a correct characterization

14   to say that it consists of your basic health and

15   the force that you may have to use in your course

16   of duty?

17        A.    Yes, sir.

18        Q.    Mr. Miles, do you recall the time frame

19   of December 22nd to December 31st of 2015?

20        A.    I did not, but I was brought up to speed

21   with my counsel.

22        Q.    Okay.  What dates were you stationed in

23   the D & E wing of Stateville from December 22nd,

24   2015 to December 31, 2015?

ANDRE MILES                                                August 31, 2018

Page 19

```
 1        A.     Per my counsel, he instructed me I was
 2   there the 22nd and the 24th.
 3        Q.     Do you remember being there
 4   specifically, or are you saying so only because
 5   your counsel has told you?
 6        A.     I am saying I have paperwork, the
 7   rosters, from the institution that told me so.
 8   I do not remember being there, so after further
 9   review, they gave me the rosters to verify where
10   I was.
11        Q.     But you yourself have no recollection of
12   being at the D & E wing of Stateville on the dates
13   I have given you?
14        A.     No, sir.
15        MR. WOOD:  So I am going to mark this document
16   as Exhibit No. 1.  I am going to give a copy to the
17   court reporter and a copy to your counsel.  This
18   the shift roster from December 22nd 2015.
19                    (WHEREUPON, said document was marked
20                    Miles Deposition Exhibit No. 1, for
21                    identification, as of 8/31/18.)
22   BY MR. WOOD:
23        Q.     Mr. Miles, do you recognize this
24   document?
```

ANDRE MILES                                           August 31, 2018

Page 20

```
 1      A.     Yes, sir.

 2      Q.     What does this document appear to be?

 3      A.     This is Illinois Department of

 4   Corrections Roster Management.

 5      Q.     And is this a document that is viewed by

 6   correctional officers at Stateville on a daily

 7   basis?

 8      A.     No, sir.

 9      Q.     So who retained control of these

10   documents?

11      A.     The shift commander, which would be the

12   major.

13      Q.     And at the beginning of each shift, does

14   he just read off where you are stationed, or how

15   does he communicate to you where your position is

16   during that shift?

17      A.     At 6:45 we report to roll call.  Then he

18   read off your assignment for the day.

19      Q.     Okay.  Mr. Miles, will you turn over to

20   the back page of the first -- excuse me, the second

21   page of this document.

22      A.     Yes, sir.

23      Q.     And then down at Line 1203 near the

24   bottom quarter of this page, is that your name next
```

Page 21

1    to the D & E Wing Officer?

2         A.    Yes, sir.

3         Q.    So this showings that you were working

4    at the D & E wings during 7 a.m. to 3 p.m. on

5    December 22nd of 2015?

6         A.    Yes, sir.

7         Q.    Now, I am going to --

8         A.    Can I say something?

9         Q.    Absolutely, yes.

10        A.    Yes, I was originally here.

11        MR. O'DONNELL:  He is, for the record, he is

12   pointing to Page 5 on Exhibit 1, and it has his

13   name and it is crossed out.

14   BY MR. WOOD:

15        Q.    Sir, you are indicating that you were

16   first stationed there, and then they came to you

17   and told you that you needed to go somewhere else,

18   or that they assigned you, and then the officer

19   instructed that and told you go here instead at the

20   beginning of your shift?

21        A.    What I am saying is I started out on a

22   writ.  Then later on in the day, they changed my

23   assignment to the -- as you can see, my name was

24   printed.  I am a writ officer.  It was printed and

Page 22

1    then it was wrote in on the second page.

2         MR. O'DONNELL:  I apologize.  It is Page 6.

3    BY MR. WOOD:

4         Q.    So you are indicating that part of the

5    way through the shift they told you to go to this

6    position?

7         A.    Yes, sir.

8         Q.    Do you remember about when they told you

9    to do that?

10        A.    I can't recall.  I just know -- I can't

11   recall what time it was.

12        Q.    Do you have a definitive memory that you

13   did perform any functions as a writ officer on that

14   date?

15        A.    I cannot recall on that particular day.

16   I have been running writ since 1997.

17        Q.    You can neither confirm nor deny that

18   you weren't simply placed at the D & E wing at the

19   beginning of the shift?

20        A.    Correct.

21        MR. WOOD:  All right.  I am going to mark a

22   second document as Exhibit 2.

23                    (WHEREUPON, said document was marked

24                     Miles Deposition Exhibit No. 2, for

ANDRE MILES                                                    August 31, 2018

Page 23

```
 1                    identification, as of 8/31/18.)
 2    BY MR. WOOD:
 3         Q.    Mr. Miles, do you similarly recognize
 4    this document?
 5         A.    Yes, sir.
 6         Q.    What is this document?
 7         A.    This is Illinois Department of
 8    Corrections Roster, as well.
 9         Q.    For December 24th of 2015?
10         A.    Yes, sir, that is correct.
11         Q.    Mr. Miles, will you again flip to the
12    second page of this document.
13         A.    Yes, sir.
14         Q.    And three-quarters of the way down the
15    page, is that your name next to the D & E Wing
16    Officer?
17         A.    Yes, sir, that is correct.
18         Q.    So this document similarly indicates
19    that you were positioned at the D & E wing of
20    Stateville Correctional Center on December 24th?
21         A.    Yes, sir, that is correct.
22         Q.    Do you have any recollection of being on
23    the job in the D & E wing on that date?
24         A.    No, sir.
```

ANDRE MILES                                                          August 31, 2018

Page 24

1          Q.      So in light of these shift logs, do you

2     have any basis to deny that you were working in the

3     D & E wings on December 22nd?

4          A.      Can you repeat that please.

5          Q.      In light of Exhibit 1, the shift roster

6     from December 22nd, do you have any basis to deny

7     that you were working in the D & E wing of

8     Stateville on December 22nd?

9          A.      No, I have no basis of denying that.

10    Per the roster, I was in Delta-Edward unit.

11         Q.      And then similarly in light of

12    Exhibit 2, do you have any basis to deny that you

13    were working in the D & E wing on December 24th?

14         A.      No, sir, per the roster, I have no

15    recollection to deny that, as well.

16         Q.      Do you recall at all coming into contact

17    with the plaintiff in this case, a Mr. Reginald

18    Hardaman?

19         A.      No, sir, I do not recall coming into any

20    contact with that name in question.

21         Q.      Going a little bit more broad,

22    Mr. Miles, have you ever collected a sick call slip

23    request from an inmate?

24         A.      Through my 22 years of employment?  Yes,

ANDRE MILES                                            August 31, 2018

Page 25

1    sir.

2         Q.    Have you ever had an incident of placing

3    one of these sick call slip requests in a pocket or

4    in any other place on your person and then

5    forgetting or neglecting to submit?

6         A.    No, sir.  State operating procedures

7    state if I receive a sick call re slip or any slip,

8    pass it onto the appropriate location, be it sick

9    call, commissary, haircut, physicals.  There is

10   various request slips and we have appropriate

11   locations for the slips.

12        Q.    So, Mr. Miles, I understand that that's

13   what the standard operating procedure is, but what

14   I am asking you is, have you personally ever placed

15   any of the sick call slip requests you have

16   received in a pocket?

17        A.    No, sir.

18        Q.    Can you say that definitively, or is

19   that just based on --

20        MR. O'DONNELL:  Objection.  I think it was

21   asked and answered.  You can answer.

22        THE WITNESS:  Sir, can you please repeat that?

23   BY MR. WOOD:

24        Q.    Absolutely.  So I will try to reask it.

Page 26

1    Can you say definitively that you remember every

2    sick call slip request you have received and that

3    you have never placed any of such sick call slip

4    requests in your pocket?

5         MR. O'DONNELL:  Same objection.

6    BY THE WITNESS:

7         A.   No, sir, I do not put inmate material

8    inside my personal pockets.  I have OCD.  I don't

9    put inmates' property on my person.

10              I would take the slip, put it where it

11   needs to go and be done with it.  I don't carry

12   inmate property on my person.

13   BY MR. WOOD:

14        Q.   Do you recall receiving a sick call slip

15   request from Mr. Hardaman at all?

16        A.   I have no knowledge of Mr. Hardaman,

17   sir.

18        Q.   So you cannot definitively state that

19   you received a sick call slip request from

20   Mr. Hardaman?

21        A.   That is correct.

22        Q.   And therefore, you cannot definitively

23   state that you did not place one of such sick call

24   slip requests in your pocket?

ANDRE MILES                                                      August 31, 2018

Page 27

 1          MR. O'DONNELL:  Objection, asked and answered.
 2   Mischaracterizes the previous testimony.
 3   BY THE WITNESS:
 4          A.    I do not put any inmate property on my
 5   person, so that goes from Mr. -- the plaintiff,
 6   himself, or any other inmate.
 7   BY MR. WOOD:
 8          Q.    Mr. Miles, do you know what a physical
 9   symptom called hives is?
10          A.    Do I know what the symptoms of hives
11   are?
12          Q.    Just do you know, would you be able to
13   look at someone -- strike that.
14                Have you heard of a medical condition
15   called hives before?
16          A.    I heard the term of hives, yes, sir.
17          Q.    Have you seen the conditions of hives?
18          A.    I just heard the term of hives.  I don't
19   know the symptoms of hives, so I couldn't tell you
20   the difference between hives, poison ivy, a rash.
21   I don't know the symptoms.  I just heard the
22   terminology of hives.  But the symptoms and
23   definition of hives, I have no knowledge of that,
24   sir.

ANDRE MILES                                                August 31, 2018

Page 28

```
 1        Q.    So, Mr. Miles, hives is a skin condition

 2   where there are little red raised bumps on the skin

 3   of an individual.

 4             And in light of this explanation, have

 5   you ever witnessed an inmate exhibiting such

 6   physical symptoms before?

 7        A.    Not personally, sir, no.  I am not

 8   medical staff.  I don't look for those symptoms.

 9        Q.    If you were to come across an inmate

10   exhibiting such symptoms, what would be your

11   response?

12        A.    I don't know what you mean by

13   "symptoms."

14        Q.    So do you remember the explanation

15   I just offered you of the --

16        A.    Red bumps.

17        Q.    Yes.

18        A.    Red raised bumps.

19        Q.    Yes.  If you were to come across an

20   inmate who was showing red raised bumps, what would

21   your response as a corrections officer be?

22        MR. O'DONNELL:  I am going to object just on

23   speculation, but you can answer.

24
```

ANDRE MILES                                          August 31, 2018

Page 29

 1   BY THE WITNESS:

 2       A.    I wouldn't speculate anything with that.

 3   I would just think it is acne.  I am not medical

 4   personnel.  I don't go examining inmates.  My job

 5   is security.

 6   BY MR. WOOD:

 7       Q.    If you saw an inmate exhibiting red

 8   raised bumps and vomiting, seeming to have

 9   dizziness, headache, in combination, what would be

10   your reaction?

11       MR. O'DONNELL:  Again, I am going to object to

12   speculation.

13   BY THE WITNESS:

14       A.    I cannot see a headache, sir.  If I see

15   an inmate vomit, I have -- I will pass that

16   information on.  If he comes to me and tells me

17   something, I will pass the information on.

18           Once again, I am not medical staff.

19   I have not been medical trained.  I am a correction

20   officer.  My job is security, custody and control.

21   BY MR. WOOD:

22       Q.    So, Mr. Miles, you indicated that if he

23   communicated to you, then you would pass that

24   information on, correct?

ANDRE MILES                                                August 31, 2018

Page 30

1        A.    Yes, that is correct.

2        Q.    But without said communication, would

3    you pass that information along to medical staff?

4        A.    What information would that be, sir?

5        Q.    So if you just walked past a cell and

6    saw an inmate vomiting, would you pass that

7    information along of your own volition?

8        A.    I can't -- I can't tell if he is

9    vomiting, or if he brushing his teeth spitting in

10   the toilet.  So me just seeing an inmate over the

11   toilet, I would not pass that information on.  He

12   could be doing several things.

13       Q.    Mr. Miles, are you aware that

14   Mr. Hardaman has alleged that he was exhibiting the

15   symptoms of hives, dizziness, headache and

16   vomiting?

17       A.    Am I aware of that?  Per my counsel, he

18   informed me of the allegations, yes, sir.

19       Q.    Mr. Miles, based on your previous

20   statement that you can either verbally communicate

21   with medical staff or turn in the sick call slip

22   request, would you make an effort to verbally

23   communicate with the medical staff if you witnessed

24   an inmate exhibiting the symptoms alleged by

Page 31

```
 1    Mr. Hardaman?

 2        A.    Once again, sir, I have no recollection

 3    of Mr. Hardaman at all.

 4        Q.    Have you previously submitted a verbal

 5    request to the medical personnel saying, "You need

 6    to come see an inmate"?

 7        A.    Yes, sir.

 8        Q.    Has there ever been an incident in which

 9    you have witnessed an inmate exhibiting physical

10    symptoms of an illness and then not verbally

11    communicated with the medical staff?

12        MR. O'DONNELL:  Objection, speculation.

13    BY THE WITNESS:

14        A.    Your question states have I ever

15    witnessed an inmate having symptoms.  Symptoms of

16    what, sir?

17    BY MR. WOOD:

18        Q.    Symptoms of a physical illness, such as

19    vomiting, breaking out in a rash, or any other

20    symptom that indicates that one is feeling ill?

21        A.    Well, I cannot verbally see illness on

22    an inmate.  If we were talking about Delta-Edward,

23    inmates are placed inside of a cell.  It is a small

24    window.
```

Page 32

1              If I am not particularly going to that

2    inmate for a particular reasoning, I would not look

3    inside of that window unless I am doing count

4    procedures.  So it is a small window, so if I am

5    not physically going to that cell, I am not going

6    to stop at that cell.  Only during count

7    procedures, I get a verbal and visual count of the

8    inmate.  So to answer the question, I do not go

9    around looking at inmates for illnesses.

10        Q.    Have you ever walked by a cell and

11   witnessed an inmate vomiting?

12        MR. O'DONNELL:  In D & E wing or Stateville,

13   in general?

14   BY MR. WOOD:

15        Q.    Stateville, in general.

16        A.    I cannot say vomiting.  I have seen

17   inmates stand over the toilet, spitting in the

18   toilet.  Brushing their teeth, spitting the water

19   out.

20              I don't know if -- I cannot say

21   vomiting, per se, but I have seen inmates inside

22   their cell by the toilet stool.  What they was

23   doing, I cannot say.

24        Q.    Mr. Miles, are you familiar with the

Page 33

1    term "feeling dizzy"?

2         A.    I heard the term before, yes, sir.

3         Q.    Do you recognize this as a

4    disorientation in which one can't really gain their

5    balance?

6         A.    That's the vague definition that I am

7    familiar with, yes, sir.

8         Q.    Have you witnessed an individual seeming

9    to exhibit such symptoms?

10        A.    Sir, I cannot see inmates' feelings.

11        Q.    But such as stumbling around, falling,

12   seeming to be unable to stand up straight?

13        A.    Have I ever seen that?

14        Q.    Correct.

15        A.    Yes, sir.  I was assigned to the outside

16   hospital detail.  I was with inmates in the

17   hospital that something was going on with them, but

18   yes, sir, I have seen that.

19        Q.    In one of the wings or otherwise

20   stations at Stateville in which inmates are kept in

21   their cells, have you witnessed such occurrences?

22        A.    Of inmates feeling dizzy?

23        Q.    Just an inmate within their cell unable

24   to stand up, gain their balance, or falling.

Page 34

1          A.     Once again, while I am making my rounds

2     inside the institution, if I don't stop at the

3     inmate cell particularly to look inside the window,

4     I am going to keep going, so I don't stop at every

5     cell to check out the inmate's posture, what are

6     they doing, unless I have a reason to go to that

7     cell.

8          Q.     You are telling me about your standard

9     operating procedure when you are on the job, and

10    I am asking have you witnessed this.

11         A.     An inmate feeling dizzy?

12         Q.     Correct.

13         A.     I cannot answer that question.  I cannot

14    see an inmate's feeling.  I don't know if he is

15    feeling dizzy.  I don't know if he is light-headed.

16    I don't know if he had a bad knee.  I don't know if

17    he had a bunion on his foot, he can't stand up.

18    I don't know if he had an ingrown toe nail.

19    I cannot see an inmate's feelings.

20              So if you are asking me, have I ever

21    seen an inmate stumble?  He can have arthritis in

22    his knees, but I can't feel that.  I can't see

23    that, sir.

24         Q.     Regardless of what the cause may be, if

ANDRE MILES                                          August 31, 2018

Page 35

1    you do see an inmate stumbling, falling or failing

2    to be able to stand up, do you check with them to

3    see if they are okay?

4        A.    Unless they verbalize to me that they

5    need assistance, no, sir.

6        Q.    So an inmate could be exhibiting signs

7    that they are clearly ill, and unless they

8    verbalize to you that they are not feeling well,

9    you are not going to provide assistance to them?

10       MR. O'DONNELL:  Objection, speculation,

11   mischaracterizes previous testimony.

12   BY THE WITNESS:

13       A.    I would not know that they are ill.

14   BY MR. WOOD:

15       Q.    But if you were walking by an inmate's

16   cell and they are unconscious, having a seizure, or

17   some sign of a symptom, what is your reaction?

18       A.    If I walk past an inmate cell and he is

19   unconscious, first of all, sir, I would have to be

20   talking to the inmate to see if he is unconscious,

21   because I would take t that he is asleep.

22             I would have to have a reason to have a

23   verbal conversation with you.  If I walk past your

24   cell, if you were the inmate, and you are laying on

ANDRE MILES                                          August 31, 2018

Page 36

1    the bed or laying on the floor, I would take it you

2    are asleep.

3         Q.    So unless an inmate initiates some

4    communication with you to indicate he needs medical

5    attention, you do not have reason to contact

6    medical services?

7         A.    Yes, sir, that is correct.

8         Q.    Once an inmate has initiated such verbal

9    communication with you, have you ever declined to

10   contact medical services?

11        A.    No, sir.

12        Q.    Can you specifically remember every

13   single incident of an inmate communicating with you

14   that they are sick and can definitively say that

15   you did not decline to contact medical services?

16        A.    No, sir, I cannot say that.  I have been

17   working with the department for 22 years.

18        Q.    So you cannot definitively say that

19   Mr. Hardaman indicated to you that he was ill and

20   that you did not decline to provide --

21        A.    That's correct, I cannot say that.  But

22   I know if he did verbalize, I would have passed

23   that information on.

24              The medical staff makes their rounds,

August 31, 2018

Page 37

1    I will pass them onto the nurse when she comes in:

2    "While making your rounds, stop at inmate --

3    whatever cell.  Make sure you stop there."  It

4    takes three seconds of my time.

5        Q.    Have you ever become agitated with an

6    inmate and informed them that it would take longer

7    for their medical request to be submitted if they

8    continue the behavior that's agitating you?

9        A.    I cannot dictate the time that the

10   medical staff will see an inmate, first of all.  My

11   job is to pass it on, and whenever they get there,

12   they get there.  I cannot dictate five minutes to

13   five hours.  That's not my job, not my

14   responsibility.  It is my job to pass that

15   information on.

16       Q.    I understand that you are defining what

17   your job responsibility is, but I am asking your

18   personal experience.

19             Have you ever delayed submitting a

20   medical request based on an inmate's behavior?

21       MR. O'DONNELL:  Objection, just asked and

22   answered.

23   BY THE WITNESS:

24       A.    What is your definition of being

ANDRE MILES                                          August 31, 2018

Page 38

```
 1   delayed?  So are you saying your client gave me a
 2   medical request slip and I did not put it in the
 3   envelope within five to ten minutes?  Is that being
 4   delayed, or six to seven hours?  Which definition
 5   of being delayed?
 6             Because if you are asking me, if I am
 7   performing my job duties and Mr. -- the plaintiff
 8   give me a slip, and if I am feeding at that time,
 9   or running showers, or letting the yard out,
10   I probably will be delayed because I have my job
11   duties to perform, so I am not going to stop what
12   I am doing to take a slip downstairs.  I'm going to
13   get downstairs after I complete my job duties as
14   performed.  So what's your definition of being
15   delayed?
16        Q.   My definition of delayed would be not
17   submitting the paper document into its envelope at
18   the first opportunity which you had to do so.
19        A.   So that's what I just answered.  If
20   I receive a request slip from an inmate and I am
21   doing something, I am not going to stop what I am
22   doing.  I am going to continue to do what I have to
23   do so.  That may be 30, 40 minutes later.
24             If I am doing cell cleanings, say, the
```

Page 39

```
 1   plaintiff give me a form, if I am doing cell

 2   cleanings, each inmate I clean their cell out, so

 3   it is going to take me 40 minutes to go downstairs

 4   to turn that slip in.

 5            So if you ask me if I am going to stop

 6   and do that?  No, that's not going to happen.  I am

 7   going to continue my job and the first availability

 8   to turn it in, it will get turned in.

 9        Q.    In this 40-minute delay period based on

10   the procedures you were performing --

11        A.    That was just one example.

12        Q.    Yes, just using that example, going off

13   that example.

14        A.    Yes, sir.

15        Q.    (Continuing) -- that's true regardless

16   of what symptoms the inmate is exhibiting?

17        MR. O'DONNELL:  Objection, speculation.

18   BY THE WITNESS:

19        A.    Once again, I cannot see feelings,

20   symptoms.  If he verbally gave me a slip and said,

21   "I need to go a sick hall or see a med tech or a

22   nurse," you are okay to me.  That's not an

23   emergency.

24            If it was an emergency, the plaintiff
```

Page 40

1    and his cellmate would be banging on the door

2    vigorously.  That's how inmates show emergencies.

3    The whole wing will be banging and hollering.

4    That's how you get -- determine emergency.

5    BY MR. WOOD:

6         Q.    But just verbally communicating that a

7    situation is an emergency, does not indicate to you

8    that it is an emergency --

9         A.    That's correct.

10        Q.    -- if it is made in a calm matter?

11        A.    That is correct.

12        Q.    So if an inmate were to be sick and

13   indicate that it is an emergency, that he needs to

14   see medical staff, you are going to go about your

15   duties and then when you get done with said duties,

16   then submit the sick call slip request?

17        A.    I think you have the wrong idea of a

18   sick call request slip.  A slip call request slip

19   is to get on the sick call list to see the medical

20   staff.  You don't go straight to the health care

21   unit.

22              So an emergency?  That's not an

23   emergency.  You requesting to go to medical, you

24   won't get there until medical deems that emergency.

ANDRE MILES                                          August 31, 2018

Page 41

```
 1    You, as an inmate, do not deem what's an emergency.
 2    Medical staff deem what's an emergency.
 3        Q.    So going off -- I'm going to go off of
 4    the other form of communicating with medical
 5    personnel.  If it is communicated to you that is an
 6    emergency, you are not going to reach out to
 7    medical staff -- strike that.
 8             If an inmate indicates to you that he is
 9    sick and it is an emergency, you are not going to
10    reach out to the medical personnel until you have
11    completed serving food, or running the showers, or
12    whatever your other duties may be?
13        MR. O'DONNELL:  Objection, it is an incomplete
14    hypothetical.
15    BY THE WITNESS:
16        A.    First of all, an inmate cannot deem
17    what's an emergency or not.  What's an emergency to
18    him is not emergency to medical staff.
19             If that's the case, every inmate's would
20    be an emergency:  Have an ingrown toenail, that's
21    an emergency, or my leg hurt, that's an emergency.
22    My tooth hurt, that's an emergency.
23             Inmates do not dictate what's an
24    emergency.  That's medical staff responsibility.
```

ANDRE MILES                                            August 31, 2018

Page 42

```
 1        Q.     What you just said, that inmates do not

 2   dictate what an emergency is, is that Stateville

 3   procedure or is that what you have come to learn in

 4   your experiences at Stateville?

 5        A.     That's medical staff responsibility.

 6        Q.     But are you taught or instructed at any

 7   point that inmates do not determine what an

 8   emergency is?

 9        A.     No, sir.  We are not taught that.

10        Q.     So this is something that's based on

11   your learning and experience while on the job?

12        A.     Yes, sir.

13        Q.     So, Mr. Miles, if you saw an inmate

14   sweating, vomiting, exhibiting hives, would you

15   have an obligation to help this individual?

16        MR. O'DONNELL:  Objection, asked and answered.

17   BY THE WITNESS:

18        A.     First of all, sir, once again, as

19   I stated, me seeing inmates sweat, I don't know

20   what hives are.  I don't feel obligated to do

21   anything, sir.  I am not a medical staff.  I cannot

22   diagnose an inmate just by looking at him.

23   BY MR. WOOD:

24        Q.     Would declining to obtain medical
```

Page 43

 1    attention for an inmate exhibiting the

 2    before-mentioned symptoms, sweating, vomiting,

 3    hives, be a violation of this inmate's right to

 4    medical treatment?

 5        MR. O'DONNELL:  Objection, speculation.

 6    BY THE WITNESS:

 7        A.    You said I am denying him medical

 8    attention?

 9    BY MR. WOOD:

10        Q.    Would it, yes.

11        A.    Well, I don't -- I am not medical, sir.

12    I can't answer that.  My job is to -- the medical

13    staff make their rounds throughout the day, so if

14    an inmate has an issue, that's the nurse and the

15    medical staff.  I am security.  I am an officer.

16            So if the medical staff is not there,

17    when they do come, I will just make sure, "Hey,

18    make sure you stop at that inmate's cell."

19            But that's all I can do.  They make

20    their rounds, on their time, on their schedule.

21    They pass out pills every day, give insulin shots,

22    give inmates Boost, whatever they need to do, so

23    I don't have anything to do with medical.  So I am

24    not denying any medical treatment because I am not

ANDRE MILES                                             August 31, 2018

Page 44

1   medical staff.

2        Q.   I think what I am trying to say is,

3   would your declining to communicate to the medical

4   personnel --

5        A.   That's the inmate's responsibility, as

6   well.  The inmate can communicate to medical staff

7   when they come.  The inmate can communicate to the

8   sergeant, to the lieutenant.  So you are placing

9   this straight towards me, but medical staff is in

10  the unit.  If there is an issue, he can tell them

11  himself or he can tell me or he can tell the

12  sergeant, the lieutenant, the major, the chaplain.

13  There is various ways of getting medical attention

14  besides from the correctional officer if an inmate

15  was that sick.

16       Q.   So, Mr. Miles, do you ever witness an

17  inmate not receiving medical attention upon their

18  first attempt to obtain medical attention?

19       A.   After the inmate submits the proper

20  paperwork to the medical staff, they deem what's an

21  emergency or they will go to the cell to see the

22  inmate, so it is out of my hands.  I don't know

23  what they are doing.  It is not my department.

24  That's the medical's department.

Page 45

1      Q.    Have you ever followed up with the

2   medical department regarding an inmate's illness?

3      A.    That's above my pay grade, sir.  I am

4   not medical.  I cannot question medical staff, what

5   theor responsibilities are and who they see.

6      Q.    Mr. Miles, are you aware that

7   Mr. Hardaman submitted a grievance regarding the

8   incident alleged?

9      A.    Am I aware of that?

10     Q.    Yes.

11     A.    Per my counsel, yes, sir.

12     Q.    Have you seen that grievance?

13     A.    No, sir.

14     Q.    I am going to mark Exhibit 3, which I am

15   going to give to the court reporter to mark.

16               (WHEREUPON, said document was marked

17               Miles Deposition Exhibit No. 3, for

18               identification, as of 8/31/18.)

19   BY MR. WOOD:

20     Q.    Mr. Miles, will you go to the third page

21   of this document.

22     A.    Yes, sir.

23     Q.    Do you recognize this document?

24     A.    I believe it is a grievance, offender's

ANDRE MILES                                          August 31, 2018

Page 46

 1   grievance.

 2        Q.    Mr. Miles, will you take a minute to

 3   kind of review the substance of Page 3 and 4, here.

 4             So have you had time to kind of review

 5   this grievance dated July 1st, 2016?

 6        A.    Yes, sir.

 7        Q.    Does anything in this grievance appear

 8   to be inaccurate to you?

 9        A.    Anything in his grievance that he wrote?

10   I have no say-so what he wrote.

11        Q.    But does anything which he has written

12   appear to be inaccurate to you?

13        MR. O'DONNELL:  Objection.

14   BY MR. WOOD:

15        Q.    Based on your experience as a

16   corrections officer?

17        MR. O'DONNELL:  I am going to object to

18   speculation.

19   BY THE WITNESS:

20        A.    I can't -- so you are asking me is there

21   anything wrong with this grievance?

22   BY MR. WOOD:

23        Q.    No.  What I am asking is, do any of the

24   facts pled in this grievance appear inaccurate to

ANDRE MILES                                              August 31, 2018

Page 47

1   you?

2        MR. O'DONNELL:  Again, object to speculation.

3   BY THE WITNESS:

4        A.    It doesn't say anything about me in

5   here, so I have no comment on it.  At some point

6   was there something about me in this grievance?

7   BY MR. WOOD:

8        Q.    So I am just simply asking if you have

9   any basis to deny what Mr. Hardaman has written in

10  this grievance.

11       A.    This is not pertaining to me, so I have

12  no comment on it.  You make it sound like -- it is

13  not against me.  He is just writing a grievance.

14       Q.    I am not saying it is against you.  I am

15  asking if you have any reason to deny --

16       A.    I can't -- I can't speak for

17  Mr. Hardaman at all.

18       Q.    Then will you flip to Pages 5 and 6.

19  This grievance is dated January 1st of 2016.

20       A.    Yes, sir.  This is basically the same

21  thing.  This had nothing to do with me.

22       Q.    This one, the second sentence, the

23  plaintiff says, "I dropped a sick slip and told

24  Officer Miles that it was an emergency.  No one

ANDRE MILES                                         August 31, 2018

Page 48

1    ever came to get me that day and by the next day my

2    situation got worse."

3         A.    Just because you give me a sick call

4    slip doesn't mean -- I put it in the appropriate

5    location and carried on with my job duties.

6    Everything else is up to medical.

7              I think you are under the impression

8    because inmate gives you a request slip, action is

9    supposed to be taken right then and there.  That's

10   not the case.  It would be sick call slips every

11   day, every minute of the day, every hour.

12             He gave me a slip.  I put it in the

13   proper location0 and that's up to medical from that

14   point on.

15        Q.    So is there anything that appears

16   inaccurate to you in this grievance?

17        A.    I have no say-so on the inmate's

18   grievance.  I am not -- I don't say what's wrong or

19   right.  I have no idea.

20        Q.    So you have no basis to deny what he has

21   written?

22        A.    Correct, I have no basis to deny.

23        MR. O'DONNELL:  Objection, I think it was

24   asked and answered.

ANDRE MILES                                      August 31, 2018

Page 49

1    BY THE WITNESS:

2        A.    If he give me a slip, I gave it to the

3    appropriate location and carried on my job duties

4    as instructed.

5    BY MR. WOOD:

6        Q.    So would it be accurate of me to

7    summarize that an inmate, who is clearly sick, he

8    gives you the medical slip, which has been given to

9    him by the medical personnel, the only duty you

10   have is to submit that sick call slip request once

11   you have completed your other duties as an officer?

12       MR. O'DONNELL:  Objection, it is speculation.

13   BY THE WITNESS:

14       A.    You said "clearly sick."  Once again,

15   sir, I cannot see an inmate being clearly sick.

16   I don't know how he feels.  I don't know his state

17   of mind.  I cannot see him being clearly sick.

18           If I get a sick call request slip,

19   I will pass it on first available chance, unless it

20   is an emergency.  Him saying it is an emergency is

21   not deemed emergency per the medical staff.  Like

22   I said, all inmates, it would be an emergency.

23           An emergency is an inmate was in his bed

24   and fell to the ground, busted his head wide open,

U.S. Legal Support, Inc.
(312) 236-8352

ANDRE MILES                                                    August 31, 2018

Page 50

```
 1   brain matter is on the ground.  That's an

 2   emergency.

 3              An inmate complaining his stomach hurt

 4   is not an emergency.

 5              An inmate is being brutally beaten by

 6   his cellmate, needs stitches, broken limbs.  That's

 7   an emergency.

 8              An inmate throwing up, vomiting, is not

 9   an emergency.

10              An inmate being raped by a cellmate,

11   torn internal cavities bleeding profusely, that's

12   an emergency.

13              "My stomach hurt" is not an emergency.

14              I can go on.  An inmate being stabbed in

15   his eye, his retina ripped, torn apart, that's an

16   emergency.

17        Q.    I think you have adequately laid out

18   what you consider an emergency to be, Mr. Miles.

19        A.    Yes, sir.

20        MR. WOOD:  I am going to mark Exhibit 4.

21   BY MR. WOOD:

22        Q.    Have you had an opportunity to review

23   the answer that your attorney filed regarding

24   Mr. Hardaman's allegations?
```

ANDRE MILES                                         August 31, 2018

Page 51

1        A.      I skimmed over it, sir.

2        Q.      Why don't you take a minute or two to

3    look through it and refresh your recollection.

4        A.      I am good, sir.

5        MR. O'DONNELL:  Just for the record, this

6    isn't his answer.  This is just the complaint.  So

7    your answers aren't on this particular document.

8                        (WHEREUPON, a document was marked

9                        Miles Deposition Exhibit No. 4, for

10                       identification, as of 8/31/18.)

11   BY MR. WOOD:

12       Q.      So Mr. Miles, if you will go to

13   Paragraph 14 of Page 4.  If you will look to where

14   it says "Answer."  In the first sentence there it

15   says "Defendant denies receiving a sick call

16   request slip from Hardaman."

17       A.      Yes, sir, go ahead.

18       Q.      You indicated to me earlier that you had

19   no recollection of the events from December 22nd to

20   December 26th 2015, correct?

21       A.      The events -- well, I can't deny

22   receiving a sick call slip --

23       MR. O'DONNELL:  Just answer that previous

24   question.

U.S. Legal Support, Inc.
(312) 236-8352

ANDRE MILES                                                    August 31, 2018

Page 52

1    BY THE WITNESS:

2         A.    What was the question?

3    BY MR. WOOD:

4         Q.    I said you have indicated to me that you

5    do not recall the events from December 22nd, 2015

6    through December 26th, 2015.

7         A.    No, sir, I wasn't at work on some of

8    those days, sir, so I can't speak for -- you said

9    December 22nd through the 26th.

10              The only days I was in that unit was on

11   the 22nd and the 24th, so the 23rd, 25th and 26th

12   I was not present.

13        Q.    But the days that you were present, you

14   answered that you cannot recall?

15        A.    Correct.

16        Q.    The first sentence specifically denies

17   receiving a sick call slip request from the

18   plaintiff.

19        A.    I misquoted, because I do not know

20   Inmate Hardaman, so I may have received one and

21   just forgot, but I do not have -- I can't put a

22   name, a face with that individual, so I misquoted.

23   I cannot deny that, because I may have received

24   one.

August 31, 2018

Page 53

1      Q.    So that first sentence, as pled, is

2  incorrect?

3      A.    Yes, sir, that is correct.  I cannot

4  deny receiving anything.  I may have gotten it and

5  if I did get it, I put it in the appropriate

6  location, sir.

7      Q.    Let's head down to the next paragraph,

8  Paragraph 15.  Again, here you specifically deny

9  the allegations contained in this paragraph,

10  correct?

11      A.    I do not recall, but, correct, I did

12  deny it, yes.

13      Q.    Since you do not remember, though, this

14  sentence as pled is similarly incorrect?

15      MR. O'DONNELL:  Make sure you read it and then

16  answer the question.

17  BY THE WITNESS:

18      A.    It says right here, sir, "Hardaman

19  watched Officer Miles place in his pocket."  Did he

20  say what pocket I placed it in, sir?  Did he say?

21  BY MR. WOOD:

22      Q.    He did not indicate.  He just indicated

23  that you placed it in your pocket.

24      A.    I don't put inmate property in my

ANDRE MILES                                                    August 31, 2018

Page 54

1  pocket, first of all.  I brought that up earlier.

2           "Inmate Hardaman stated he partially

3  hanging out of Officer Miles' pocket."  That is,

4  once again, I don't put inmate property on my

5  person.  So that is -- so my answer is wrong.  I do

6  not recall speaking to Mr. Hardaman.

7           If he did give me a slip, when I got my

8  first available opportunity, I put it inside of the

9  appropriate location, but I do not remember talking

10  to him, seeing him.

11      Q.    So based on your lack of a recollection

12  of this event, this sentence in your answer of

13  Paragraph 15 is incorrect?

14      A.    Yes, sir, that is correct.

15      Q.    Mr. Miles, will you take a look at

16  Paragraph 17, please.

17      A.    Yes, sir.

18      Q.    Based on your lack of a recollection of

19  this event, do you have a basis to deny what is

20  pled in this paragraph?

21      A.    I don't know Officer Williams, sir.

22  I was --

23      Q.    Specifically, to you.

24      A.    Once again, it says through the 26th.

ANDRE MILES                                              August 31, 2018

Page 55

1    I was only there two of the six days.  I have no --

2    no knowledge of -- no, I don't recall any of this.

3         Q.    So you don't have a basis to deny it?

4         A.    No, no basis to deny it, sir.  Can

5    I make a statement, sir?

6         Q.    You can make a statement.

7         MR. O'DONNELL:  You can answer.

8    BY THE WITNESS:

9         A.    He keeps saying from the 22nd through

10   the 26th, but it is clearly stated per the records

11   I was only there for those two days.  So if your

12   plaintiff was that ill, there is ample people to

13   get medical attention from, 3 to 7 shift, 11 to 7

14   shift, but he is basically putting this all on me,

15   if he was that ill.

16   BY MR. WOOD:

17        Q.    Mr. Miles, you indicated that you are

18   not familiar with the co-defendant Office Williams,

19   but have you heard of him or otherwise familiar

20   with his name at all?

21        A.    Not at all.

22        Q.    Are you familiar of any other claims

23   that have been asserted against him?

24        A.    I have no knowledge of Mr. Williams,

Page 56

```
 1   whatsoever.  I couldn't tell you if it was a male
 2   or female.  Is it a male or female?
 3        Q.    He is a male.
 4        A.    Okay.  Office Williams.  I know females
 5   who are Williams.
 6        Q.    Have you spoken about the incident
 7   involving Mr. Hardaman to anyone else?
 8        A.    What incident with Mr. Hardaman?
 9        Q.    So what we have been discussing here,
10   that he -- so one aspect would be that he, an
11   inmate, who was sick and didn't receive medical
12   attention.
13        A.    I didn't know anything about this until
14   my counsel brought it to my attention, sir.
15        Q.    Mr. Miles, what role, if any, do you
16   play when an inmate uses the emergency call button
17   in their cell?
18        A.    No role whatsoever.
19        Q.    Would you explain to me what occurs once
20   an inmate presses their emergency call button,
21   please?
22        A.    When an inmate presses the emergency
23   call button that is located in the inmate's cell,
24   that button goes through the main control center.
```

ANDRE MILES                                                    August 31, 2018

Page 57

```
 1                The main control is the area where are
 2   all the cameras, all the microphones, so the inmate
 3   can speak to main control through the speaker
 4   system.  And at that point, main control would take
 5   it from there.
 6        Q.    Would main control contact you?
 7        A.    They would contact who they need to
 8   contact, being the sergeant, the lieutenant, the
 9   officer, medical staff, so they would distribute
10   who they need to contact.  So, yes, they can
11   contact me.
12        Q.    So you would potentially have a role?
13        A.    If they contact me, yes.
14        Q.    And, therefore, it is incorrect to say
15   that you wouldn't have a role?
16        A.    That is correct, yes, sir.  But the
17   question stated if they press the button.  I have
18   nothing with the button.
19                My role comes from a third party, so it
20   is technically correct, but I say I had no role.
21   If he pushes the button, I have no knowledge of him
22   pushing the button.  It would take for the third
23   party to contact me.  So him pushing the button
24   does not affect me whatsoever.
```

ANDRE MILES                                                    August 31, 2018

Page 58

    1        Q.    What if an inmate communicates to you
    2    that his emergency call button is not functioning?
    3        A.    Well, he would pass it on to me then.
    4        Q.    Are you aware that Mr. Hardaman here has
    5    alleged that his emergency call button was not
    6    functioning?
    7        A.    Once again, sir, I have no recollection
    8    of Mr. Hardaman.  I don't recall speaking to him,
    9    so --
   10        Q.    Just based on your reading of the
   11    complaint or what counsel -- the information
   12    counsel shared with you.
   13        A.    Did I know his call button did not work?
   14        MR. O'DONNELL:  Objection to speculation.
   15    BY THE WITNESS:
   16        A.    So I never checked it myself to see if
   17    it worked, so I can't say if it worked or not, sir.
   18        MR. WOOD:  I think I am done for now.
   19                      EXAMINATION
   20    BY MR. O'DONNELL:
   21        Q.    Just a few questions.  Just going to go
   22    over the grievance.
   23              Were you ever interviewed in regards to
   24    Mr. Hardaman's grievance that was submitted as

ANDRE MILES                                    August 31, 2018

Page 59

1    Exhibit 3?  Were you ever interviewed in regard to

2    that grievance?

3         A.    I cannot recall if I was interviewed

4    about that or not.

5         Q.    Prior to this litigation, did you have

6    any knowledge of Mr. Hardaman's grievance against

7    you?

8         A.    No, sir.

9         Q.    Turn to sick call slips.  So can an

10   inmate submit a sick call slip to a correctional

11   officer?

12        A.    Yes, sir.

13        Q.    Who else could an inmate submit a sick

14   call slip to?

15        A.    Inmate, who else?  Correctional

16   sergeant, correctional lieutenant, the major,

17   medical staff, the commissary personnel, the

18   chaplain.

19        Q.    Okay.  How often do the medical staff

20   make rounds?

21        A.    Nurses make rounds every shift.  There

22   are three shifts in a day.  Med techs, medical

23   technicians, also make rounds, minimum every shift,

24   and there are three shifts in the day.  Med techs

Page 60

1    make rounds up to four to five times on the shift,

2    but they have to make a minimum one time.  If they

3    come and pass off medication to one of the

4    offenders, and another fellow needs something, they

5    come back.  So basically, the med techs are the

6    ones that do the majority of the running around for

7    the medical personnel.

8         Q.    Based off of your 20 years of experience

9    as a correctional officer, generally, who are

10   inmates supposed to submit the sick call slips to?

11        A.    Medical personnel.

12        Q.    Let's say that you were given a sick

13   call slip, what do you do when you receive a sick

14   call slip?

15        A.    Put it in the medical envelope that's

16   located by the office downstairs.

17        Q.    After you place that into the medical

18   slip folder, do you have any other involvement in

19   an inmate's medical care?

20        A.    No, sir, not at all.

21        Q.    Do you have any authority to place an

22   inmate in medical?

23        A.    No, sir, not at all.

24        Q.    Who does?

ANDRE MILES                                                    August 31, 2018

Page 61

1        A.      Medical personnel.

2        Q.      Would there be any documents showing

3    that you submitted any sick call slips?

4        A.      Any documents --

5        Q.      Right.  Would there be any logs or

6    anything in that regard?

7        A.      No, sir.  No, sir.

8        Q.      Have you ever not submitted a sick call

9    slip after you received one?

10       A.      No, sir.  I submit it in the envelope

11   the first chance I get.

12       MR. WOOD:  Objection, speculation.

13   BY MR. O'DONNELL:

14       Q.      Then returning to the emergency call

15   system.  When an inmate presses the emergency call

16   system, based on your previous testimony, it goes

17   to a call center?

18       A.      Yes, sir.

19       Q.      And then what does the call center do,

20   if you know, when they receive an inmate pressing

21   an emergency call system?  What do they do?

22       A.      They forward the information onto the

23   appropriate location.

24       Q.      Who determines whether or not -- whether

ANDRE MILES                                                    August 31, 2018

Page 62

1      or not it is an emergency?

2          A.     The medical staff.

3          Q.     So would that ever be you?

4          A.     No, sir, I am a correction officer, sir.

5          Q.     And you stated that you would sometimes

6      be involved if an inmate -- or, if the call center

7      would reach out to you.

8                 What would you do when the call center

9      would reach out to you in regards to an inmate

10     pressing an emergency call button?

11         A.     Depends on what the situation is.  The

12     emergency call center button is also used for

13     visits, when an inmate has a visit, the call center

14     will call on the microphone and advise an inmate,

15     "You have a visit."  Then the call center would

16     call me, "Officer Miles, be advised inmate in cell

17     whatever has a visit."  And I will carry on from

18     there.  So it depends on the reasoning the call

19     center is calling an officer.

20         Q.     Let's say it has to deal with medical.

21     Would you have any involvement in terms of the

22     medical care of an inmate if the emergency call

23     system would reach out to you?

24         A.     No, sir.  The medical -- the call

Page 63

1    center, main control, would notify medical.  If it

2    is a medical emergency, then they would determine

3    if the inmate has an emergency.

4         Q.    We were previously talking about an

5    emergency situation versus a non-emergency

6    situation.  Can you tell me what a Code 3 is?

7         A.    Code 3 is medical emergency.

8         Q.    And counsel was giving previous

9    hypotheticals, one being a nonverbal response, and

10   whether or not you would have any job duty in

11   regards to that nonverbal response.

12             When would you submit a Code 3?  When

13   would you call in a Code 3?

14        A.    A Code 3 would be deemed an emergency.

15   So, example, if I am doing my 7 a.m. count, inmates

16   have to have a visual and a verbal response.  If

17   I am banging on the door trying to get the inmate's

18   attention and he is nonresponsive, so that's Code

19   3, nonresponsiveness.

20        Q.    So that's my question.  There are

21   situations in which when an inmate does not

22   verbally express to you, that that could be an

23   emergency in which you would then call a Code 3?

24        A.    Yes, sir.

ANDRE MILES                                            August 31, 2018

Page 64

1        Q.    So, for example, let's say an inmate is

2    lying on the floor and there is blood, would that

3    be a situation in which you would call a Code 3?

4        A.    Yes, sir.

5        Q.    That would be -- and would you call that

6    Code 3 even though he did not verbally express to

7    you that it was an emergency?

8        A.    Yes, sir, that's correct.

9        Q.    And based off of your experience as a

10   correctional officer for 20 to 30 years, would you

11   consider stumbling an emergency?

12       A.    No, sir.

13       Q.    Would you consider falling an emergency?

14       A.    No, sir.

15       Q.    Would you consider vomiting an

16   emergency?

17       A.    No, sir.

18       Q.    I am going to go back to your complaint,

19   what has been marked as, I believe it was,

20   Exhibit 4.

21             I would like to go back to Paragraph 15.

22       A.    Yes, sir.

23       Q.    Have you ever placed a sick call slip in

24   your pocket?

ANDRE MILES                                    August 31, 2018

Page 65

1        A.      No, sir.

2        Q.      Have you ever had a sick call slip

3    partially hanging out of your pocket?

4        A.      No, sir.

5        Q.      Have you ever indicated to any inmate

6    that you would delay his sick call request slip, in

7    terms of you submitting it, if an inmate continues

8    to inquire about it?

9        A.      No, sir.

10       Q.      Given those statements, can you

11   affirmatively deny Paragraph 15?

12       A.      Yes, sir.

13       Q.      So you believe your testimony today that

14   answer to 15 is correct?

15       A.      Yes, sir.

16       Q.      And then for Paragraph 17, I would like

17   you to read the first sentence.

18       A.      Aloud, sir?

19       Q.      No, just to yourself.  Just generally

20   speaking, have you ever neglected an inmate from

21   submitting a sick call slip?

22       A.      No, sir.

23       Q.      Do you have any authority or control or

24   any involvement in regards to an inmate's medical

ANDRE MILES                                                    August 31, 2018

Page 66

1    care?

2         A.    No, sir.

3         Q.    Is it safe to say that your job duty as

4    a correctional officer is more or less a messenger,

5    so if an inmate expresses to you that he is sick

6    and he gives you a sick call slip, your job duties

7    as a correctional officer is to submit that slip?

8         A.    Yes, sir.

9         Q.    And you have no other involvement in

10   terms of his medical care after that?

11        A.    That is correct, sir.

12        Q.    Can you explain to me the cell in D & E

13   wing?  As you were testifying before, there is a

14   small window.

15             Can you just explain the cell to me?

16        A.    It is a steel door that travels from

17   right to left when you open it, and it is a peep

18   hole approximately 10 inches by 20 inches wide that

19   you can look through.

20        Q.    So the cell isn't bars?

21        A.    No, sir.

22        Q.    It is a solid material in which the only

23   thing that you can see through is through that hole

24   that you actually testified to?

Page 67

1        A.    Yes, sir, that is correct.

2        MR. O'DONNELL:  I am done.

3        MR. WOOD:  I have got a few more.

4                    FURTHER EXAMINATION

5   BY MR. WOOD:

6        Q.    So going back to what counsel talked to

7   you about, the emergency call system, Mr. Miles.

8        A.    Yes, sir.

9        Q.    When that system is broken, how does an

10  inmate communicate with the central unit?

11       A.    They don't.

12       Q.    So does that, then, provide you a duty

13  to communicate with the central unit for them?

14       MR. O'DONNELL:  Objection, speculation.

15  BY THE WITNESS:

16       A.    No, sir.

17  BY MR. WOOD:

18       Q.    So an inmate with a broken communication

19  system has no means of communicating to the central

20  unit?

21       MR. O'DONNELL:  Objection, speculation.

22  BY THE WITNESS:

23       A.    If it is broken, that's correct, sir.

24

Page 68

```
 1   BY MR. WOOD:

 2        Q.    So, an inmate has no means of

 3   communicating their medical symptoms to the central

 4   unit?

 5        A.    If it is broken, correct.

 6        Q.    So then the central unit cannot

 7   communicate with the medical staff on behalf of the

 8   inmate?

 9        A.    Depends on how is it broken.  It may be

10   one speaker is out --

11        Q.    Assuming it is not functioning.

12        A.    Assuming -- correct, assuming the

13   central main control is down and broken for that

14   inmate's cell, he cannot communicate with main

15   control, that is correct.

16        Q.    So in such an instance, one of an

17   inmate's channels of obtaining medical care is no

18   longer available to them?

19        A.    One channel, that is correct, one of the

20   various many channels, one out of the 20, yes.

21        Q.    And in such an instance, would you act

22   as an intermediary in any way?

23        MR. O'DONNELL:  Objection to speculation as to

24   whether he knows the control button is broken.
```

Page 69

1    BY MR. WOOD:

2        Q.    Let me rephrase that.  An inmate

3    communicates to you that his emergency call button

4    is not working.

5             Would you then make any effort on his

6    behalf to communicate with either central unit or

7    the medical staff?

8        A.    If he is talking to me about his

9    emergency call button, he can tell me what the

10   problem is.

11            The emergency call button is for when

12   you are not talking to any staff, other staff, be

13   it myself, correction officer, the sergeant.

14            So if you are able to talk to me, tell

15   me what the problem is, I don't care about the

16   emergency call center.  Tell me what the problem

17   is:  "I need to go to sick call."  I will take care

18   of it.

19            So you are not going to come tell me

20   about your emergency call button being broke if you

21   are talking to me, because we are communicating.

22   You are communicating with someone.  So if he is

23   communicating to me, that's irrelevant.  The issue

24   is at hand, "I am sick.  I need to go to health

August 31, 2018

Page 70

1    care."  "10-4, I will pass it on."

2        Q.    But assuming this individual has already

3    dropped his sick call slip request, and then

4    informs you that his emergency communication system

5    is not working.  Now, you have -- if you had

6    dropped the sick call slip request already, would

7    you take any further action for this inmate?

8        A.    If he gave me the sick call request

9    slip, I gave it to the personnel I need to give it

10   to, it is up to that person to put him on the sick

11   call list.  That's up to the medical personnel.  It

12   is a waiting list.

13            Inmates get incarcerated and think they

14   are supposed to get immediate medical care, which

15   is not true.  I, as a correction officer, can't

16   make a doctor's appointment.

17       Q.    But in such an instance, the broken call

18   system warrants no further action beyond submitting

19   a maintenance request?

20       A.    That's up to maintenance.  But if he is

21   verbalizing to me or any other personnel, tell what

22   the problem is.  So that's, just like I said, one

23   avenue of getting someone's attention.  There are

24   several other ones.

Page 71

1      Q.    I would like to go to the medical staff,

2    which you indicate make their rounds.

3              Are there medical personnel assigned to

4    each unit?  For instance, does D & E wing have

5    their own specific medical personnel?

6      A.    They have zones.  We have Zone 1, Zone 2

7    and Zone 3, so we have medical personnel assigned

8    to zones.

9              Zone 1 would be from Alpha to,

10   I believe, Foxtrot.  Zone 2, I believe, not sure

11   maybe from Hotel to Lima, and Zone 3 would be from,

12   let's say, Quebec to Whiskey.

13     Q.    So there are three staffs of medical

14   personnel?

15     A.    I don't know.  I don't work for medical.

16   I don't know how many staffs there are.

17     Q.    But how many correction officers are on

18   duty at any time in Stateville?

19     A.    Above my pay grade, sir.

20     Q.    Okay.  Is it fair to say that there are

21   significantly more corrections officers than there

22   are medical personnel?

23     A.    Yes, sir.

24     Q.    So would it be safe to say that a

Page 72

```
 1   corrections officer -- there are much more

 2   resources for corrections officers to submit

 3   medical requests than medical -- than there are

 4   medical personnel -- strike that question.  I am

 5   going to rephrase it.

 6            So it is safe to say there are many more

 7   corrections officers to collect sick call request

 8   slips than there are medical personnel to request

 9   such requests?

10      A.    It is the medical staff's

11   responsibility.  That's their responsibility.

12      Q.    But an officer can also --

13      A.    That's a courtesy.

14      Q.    It is a courtesy?  It is not in your

15   assigned duties to submit sick call slip requests?

16      A.    Not assigned duties.  It is -- I mean,

17   if we get one, we can give it to the appropriate

18   personnel, but we don't do anything with it.  So if

19   you want -- you are not going to give your

20   commissary slip to the nurse.  You are not going to

21   give your barber shop slip to the chaplain.  You

22   are not going to give your visiting list to the

23   nurse.

24      Q.    But you are the unifying figure that's
```

Page 73

1    present for all of these instances, and you can

2    submit these requests --

3         A.    Yes, sir.

4         Q.    -- on behalf of the inmate?

5         A.    Correct.

6         Q.    So is it a duty for you to submit these

7    sick call slip requests on behalf of the inmate?

8         MR. O'DONNELL:  Objection, speculation.

9    BY THE WITNESS:

10        A.    You keep saying "on behalf of the

11   inmate."  The inmate can submit it himself.  He can

12   give it to them himself.  This is his medical re

13   slip.  He can give it himself, as well.

14             So you get expediency if you give it to

15   the nurse than if you give it to the correction

16   officer.  You wouldn't give your medical slip to

17   the barber shop, so the inmate's -- it is his

18   responsibility.  The nurse makes her rounds and med

19   techs are in the building all day.

20   BY MR. WOOD:

21        Q.    But you are the -- what I am trying to

22   say is you are the intermediary between the inmate

23   and these services?

24        A.    I am the correction officer on the wing,

Page 74

1   security, custody and control.

2              A medical slip, I can take it and I am

3   passing it on.  I am the messenger.  But if you

4   want to go to the medical unit, when that nurse

5   comes, you will give it to the nurse.  You will

6   give if to the med tech.  It is going a direct

7   route to the hospital.  All I am going to do is put

8   it in an envelope downstairs for them to get it

9   out.

10       Q.    But I am safe in saying that you have

11  significantly more -- significant more time and

12  significant more opportunity to submit --

13       A.    No, sir.

14       Q.    -- a call slip request?

15       A.    No, sir, I have other duties as

16  assigned.  I am running showers.  I am getting yard

17  out.  I am feeding.  I am running visits out.  I am

18  sending people to the psych ward, to the psych

19  ward, getting physicals.  I have many

20  responsibilities.  That's just one.

21       Q.    But you are just assigned to this D & E

22  wing and they are assigned to, the example you

23  offered, A through F?

24       A.    But by me being assigned to D & E,

Page 75

1    I still have more responsibilities in that unit.

2    It is 180 inmates that go into the yard.  We run

3    the showers.  We have got to feed them.  Some

4    getting physicals.  Some going to B of I, which is

5    Bureau of Investigations.  I am doing various jobs.

6              The nurses' job is to pass out the meds

7    and get request slips.  So to answer your question,

8    I have more responsibilities than a medical staff

9    by being a unit officer.

10        Q.    But you spend significantly more time

11   with these inmates than these nurses get to.  So

12   for instance, you are in D & E wing?

13        A.    Yes, sir.

14        Q.    You have however many inmates?

15        A.    180.

16        Q.    180?

17        A.    Yes, sir.

18        Q.    180.  So assuming that there are the

19   same amount in A through F, they have 540 inmates

20   to attend to.

21        A.    And all they are doing is making their

22   rounds:  "You need anything?  Taking your meds?"

23              But I am in the unit, one inmate have to

24   go to get a haircut.  This inmate has a visit.

Page 76

1    I have to feed all of them.  I have to run the

2    showers, all yard lines out, to gallery, we are

3    cleaning the cells.  I am working all day.

4              The nurse, all she is doing is walking

5    past, picking up request slips and passing out

6    meds.  She is not running hair cuts.  She is not

7    running legal visits.  She is not -- she is just

8    doing that one particular job.  As me, as the

9    correction officer, I am doing several jobs.

10        Q.    You have an eight-hour shift to devote

11   to 180 inmates and they have an eight-hour shift to

12   devote to 540 inmates.  Therefore, is it safe to

13   say that you have -- you have more availability

14   with these inmates and --

15        A.    No, sir.

16        MR. O'DONNELL:  Let him finish the question

17   and then answer.

18   BY MR. WOOD:

19        Q.    (Continuing) -- and more time in which

20   you are in a position to obtain an inmate's sick

21   call slip requests from one of these inmates?

22        MR. O'DONNELL:  I object to asked and

23   answered.

24

ANDRE MILES                                                    August 31, 2018

Page 77

1    BY THE WITNESS:

2        A.    The medical staff responsibility is to

3    walk to every cell.

4    BY MR. WOOD:

5        Q.    I understand what their responsibility

6    is.  I am specifically asking you, is that you have

7    more time with that inmate who wants or needs to

8    submit a sick call slip request than the nurse?

9        A.    To answer your question, yes, I am in

10   that unit longer than the nurse is.  She may be in

11   there 40 minutes.  I may be in there for five

12   hours, correct.

13       Q.    Then I would like to go to the answer,

14   which I believe is marked Exhibit 3.  So going back

15   to Paragraph 15.

16             You have been a corrections officer for

17   22 years?

18       A.    Yes, sir.

19       Q.    So you remember each instance of

20   receiving and submitting a sick call slip request?

21       A.    No, sir.

22       Q.    Therefore, you cannot specifically say

23   that you received and submitted this sick call slip

24   request?

ANDRE MILES                                           August 31, 2018

Page 78

1          A.     That is correct, I cannot.

2          Q.     So you do not have specific memory of

3     what Mr. Hardaman has alleged in Paragraph 15?

4          A.     Correct.

5          Q.     Therefore, your answer that you cannot

6     deny what is pled here still stands as --

7          MR. O'DONNELL:  Read this.

8     BY THE WITNESS:

9          A.     I cannot deny that, because I do not

10    remember that.  So I may have received one from

11    him, and if I did receive it, I just passed it on.

12    So I cannot deny I received one from him, so my

13    answer is incorrect.

14         MR. WOOD:  Thank you.  That's all I have.

15         MR. O'DONNELL:  Just a quick couple of

16    follow-ups.

17                      FURTHER EXAMINATION

18    BY MR. O'DONNELL:

19         Q.     Andre, what are your job duties a

20    correctional officer?

21         A.     As correctional officer, we have to

22    count the unit.  We have to get the inmates to

23    whatever location they need to be.

24                Stateville NRC is a reception center.

August 31, 2018

Page 79

1    So by being a reception center, we have to classify

2    all inmates, so we have the classification lines we

3    have to get out.  We have a counselor line.  We

4    have a medical line.  We have a dental line.  We

5    have a B of I, which is Bureau of Investigation

6    line.  All of those lines need to get out.  Inmates

7    need to go to their appropriate locations.

8              As a correction officer, I must get all

9    the visits out.  I must feed the unit.  It depend

10   on what day of the week it is if the inmates are

11   getting showered.  Depending on what day of the

12   week it is, inmates have to go to the yard.  I have

13   to get inmates' haircuts.  I have several duties as

14   a correctional officer within a day working in the

15   cell house unit.

16        Q.   Okay.  Is one of your duties as

17   correctional officer, if you were to receive a sick

18   call slip, is it your duty to then put that sick

19   call slip into a folder?

20        A.   Yes, sir, that is correct.

21        Q.   Do you have any duty at all to ensure

22   that an inmate receives medical attention?

23        A.   Not at all.

24        Q.   Whose duty would that be, if you know?

ANDRE MILES                                        August 31, 2018

Page 80

1        A.    Medical personnel.

2        MR. O'DONNELL:  That's all.

3                   FURTHER EXAMINATION

4    BY MR. WOOD:

5        Q.    I have got one quick one.  Is it a

6    courtesy for you to submit the sick call slip

7    request or is it a duty?

8        MR. O'DONNELL:  Objection, speculation.  Are

9    you stating whether or not he has actually received

10   it?

11       MR. WOOD:  Just based on his -- he earlier

12   indicated that it was a courtesy for him to submit

13   the sick call slip requests.  I am asking him if he

14   believes that answer stands true, or if he

15   considers it a duty.

16   BY THE WITNESS:

17       A.    If I received a request slip, there are

18   several type of request slips.  It is my duty to

19   pass information on.

20       MR. WOOD:  Okay.  That's all.

21       MR. O'DONNELL:  Mr. Miles, I didn't explain

22   this part to you, but essentially you are able to

23   waive or reserve your deposition testimony today.

24                I know you said you gave depositions

Page 81

1    before.  If you waive your testimony, you are more

2    or less stating that everything that you said is

3    accurate today, or you can reserve your signature.

4              And if you reserve your signature, then

5    the court reporter will give you your deposition

6    and you can look it over to make sure that

7    everything that you said was correct and that she

8    properly put down everything that you said today

9    correctly.

10             So it is your option whether or not you

11   want to waive your signature today, or whether or

12   not you want to reserve it for tomorrow or whenever

13   she gets it to you to look it over.

14             But if you believe that everything you

15   said today was accurate and that you believe that

16   the court reporter took down everything correctly,

17   you can waive it.  It is your decision.

18        THE WITNESS:  You are saying do I want a copy

19   of this?

20        MR. O'DONNELL:  Right, so it would be a copy

21   for you to look at and then you could look it over.

22        MR. WOOD:  Do you want it to be a rough draft

23   that is like sent to you for you to look over and

24   say that anything is incorrect or --

ANDRE MILES                                    August 31, 2018

Page 82

1        MR. O'DONNELL:  If you trust the court

2    reporter --

3        THE WITNESS:  I trust her.  Oh, yes, she is

4    trustworthy.

5        MR. O'DONNELL:  So you will waive it?

6        THE WITNESS:  So you are my counsel.  Can I

7    waive it?

8        MR. O'DONNELL:  Yes.

9        THE WITNESS:  Yes.

10               FURTHER DEPONENT SAITH NOT.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ANDRE MILES                                                         August 31, 2018

Page 83

1    STATE OF ILLINOIS   )  SS:

2    COUNTY OF C O O K   )

3               I, JOANNE H. RICHTER, a Certified

4    Shorthand Reporter of Illinois, do hereby certify:

5               That previous to the commencement of the

6    examination of the witness, the witness was duly

7    sworn to testify the whole truth concerning the

8    matters herein;

9               That the foregoing deposition transcript

10   was reported stenographically by me, was thereafter

11   reduced to typewriting under my personal direction

12   and constitutes a true record of the testimony

13   given and the proceedings had;

14              That the said deposition was taken

15   before me at the time and place specified;

16              That I am not a relative or employee or

17   attorney or counsel, nor a relative or employee of

18   such attorney or counsel for any of the parties

19   hereto, nor interested directly or indirectly in

20   the outcome of this action.

21              IN WITNESS WHEREOF, I set my hand at

22   Chicago, Illinois, the 18th day of September, 2018.

23

24                         C.S.R. Certificate No. 84-2082.

ANDRE MILES                                                August 31, 2018

```
                                                         Page 84
 1                        I N D E X

 2

 3    WITNESS                        EXAMINATION

 4    ANDRE MILES

 5         By Mr. Wood                    3, 67, 80

 6         By Mr. O'Donnell              58, 78

 7

 8

 9

10                       E X H I B I T S

11

12    NUMBER                              MARKED FOR ID

13

14    MILES DEPOSITION EXHIBIT

15         No. 1                             19

16         No. 2                             22

17         No. 3                             45

18         No. 4                             51

19

20

21

22

23

24
```

ANDRE MILES

August 31, 2018
Index: 1..bed

**1**

**1** 19:16,20 21:12 24:5 71:6,9

**10** 7:3,4 66:18

**10-4** 70:1

**11** 14:23,24 55:13

**1203** 20:23

**14** 51:13

**15** 53:8 54:13 64:21 65:11,14 77:15 78:3

**17** 54:16 65:16

**180** 75:2,15,16,18 76:11

**1972** 4:4

**1996** 5:18 8:18

**1997** 22:16

**1st** 5:18 46:5 47:19

**2**

**2** 22:22,24 24:12 71:6,10

**20** 60:8 64:10 66:18 68:20

**2001** 4:9

**2015** 18:19,24 19:18 21:5 23:9 51:20 52:5,6

**2016** 46:5 47:19

**22** 7:1 9:17 15:11 17:7 18:2 24:24 36:17 77:17

**2214** 4:20

**22nd** 4:4 18:19,23 19:2,18 21:5 24:3,6, 8 51:19 52:5,9,11 55:9

**23rd** 52:11

**24th** 19:2 23:9,20 24:13 52:11

**25th** 52:11

**26th** 51:20 52:6,9, 11 54:24 55:10

**3**

**3** 14:23 21:4 45:14, 17 46:3 55:13 59:1 63:6,7,12,13,14,19, 23 64:3,6 71:7,11 77:14

**30** 38:23 64:10

**31** 18:24

**31st** 18:19

**334** 4:12

**4**

**4** 46:3 50:20 51:9,13 64:20

**40** 38:23 39:3 77:11

**40-minute** 39:9

**46** 4:2

**5**

**5** 10:5,7 21:12 47:18

**540** 75:19 76:12

**6**

**6** 22:2 47:18

**60436** 4:7

**6:45** 20:17

**7**

**7** 14:23,24 21:4 55:13 63:15

**8**

**8** 10:5,6

**8/31/18** 19:21 23:1 45:18 51:10

**9**

**900** 4:6

**92nd** 4:12

**A**

**A-N-D-R-E** 3:13

**a.m.** 10:5,6 14:24 21:4 63:15

**Absolutely** 12:22 21:9 25:24

**academy** 9:3,4,8,9, 11,13 10:2 11:6,8, 10,12,15

**accurate** 49:6 81:3,15

**acne** 29:3

**act** 68:21

**action** 48:8 70:7,18

**AD's** 18:11

**address** 4:5,6

**adequately** 50:17

**advise** 62:14

**advised** 62:16

**affect** 57:24

**affirmatively** 65:11

**age** 4:2

**agents** 18:11

**agility** 8:22

**agitated** 37:5

**agitating** 37:8

**ahead** 5:2 51:17

**aid** 18:10

**allegations** 6:19 7:3 16:16 30:18

**50**:24 53:9

**alleged** 7:13,19 30:14,24 45:8 58:5 78:3

**Aloud** 65:18

**Alpha** 71:9

**amount** 9:22,24 10:8 75:19

**ample** 55:12

**and/or** 9:6

**Andre** 3:12,13 78:19

**ANDRES** 3:3

**annual** 18:5,7

**answers** 51:7

**apologize** 22:2

**appears** 48:15

**applied** 8:21

**appointment** 70:16

**approximately** 4:16 10:5 66:18

**April** 4:4 5:18

**area** 57:1

**arrested** 6:11

**arthritis** 34:21

**asleep** 35:21 36:2

**aspect** 56:10

**asserted** 8:6 55:23

**assigned** 21:18 33:15 71:3,7 72:15, 16 74:16,21,22,24

**assignment** 17:9, 11,12 20:18 21:23

**assistance** 35:5,9

**assuming** 68:11, 12 70:2 75:18

**ate** 16:12

**attacked** 8:2

**attempt** 44:18

**attend** 5:4 75:20

**attention** 12:17 13:3 14:1 15:12 16:18 36:5 43:1,8 44:13,17,18 55:13 56:12,14 63:18 70:23 79:22

**attorney** 50:23

**authority** 60:21 65:23

**availability** 39:7 76:13

**avenue** 70:23

**aware** 16:11,16 30:13,17 45:6,9 58:4

**B**

**back** 7:9 10:3 20:20 60:5 64:18,21 67:6 77:14

**background** 8:23

**bad** 34:16

**balance** 33:5,24

**banging** 40:1,3 63:17

**barber** 72:21 73:17

**bars** 66:20

**based** 25:19 30:19 37:20 39:9 42:10 46:15 54:11,18 58:10 60:8 61:16 64:9 80:11

**basic** 12:9 18:14

**basically** 6:21 12:7 47:20 55:14 60:5

**basis** 20:7 24:2,6,9, 12 47:9 48:20,22 54:19 55:3,4

**beaten** 50:5

**bed** 36:1 49:23

ANDRE MILES

August 31, 2018

**before-mentioned** 43:2

**begin** 11:19,20

**beginning** 8:11 20:13 21:20 22:19

**behalf** 68:7 69:6 73:4,7,10

**behavior** 37:8,20

**believes** 80:14

**birth** 4:3,4

**bit** 24:21

**bleeding** 50:11

**blood** 64:2

**Bogdan** 4:20

**Boost** 43:22

**bottom** 20:24

**brain** 50:1

**branch** 5:23

**breaking** 31:19

**broad** 24:21

**broke** 69:20

**broken** 50:6 67:9, 18,23 68:5,9,13,24 70:17

**brought** 16:14 18:20 54:1 56:14

**brushing** 30:9 32:18

**brutally** 50:5

**building** 73:19

**bumps** 28:2,16,18, 20 29:8

**bunion** 34:17

**Bureau** 75:5 79:5

**busted** 49:24

**button** 13:3,10,11, 16 56:16,20,23,24 57:17,18,21,22,23 58:2,5,13 62:10,12 68:24 69:3,9,11,20

**buttons** 13:11

---

**C**

**call** 13:2,9,11,15 14:2,13,15,19 15:3, 18 20:17 24:22 25:3,7,9,15 26:2,3, 14,19,23 30:21 40:16,18,19 48:3,10 49:10,18 51:15,22 52:17 56:16,20,23 58:2,5,13 59:9,10, 14 60:10,13,14 61:3,8,14,15,17,19, 21 62:6,8,10,12,13, 14,15,16,18,22,24 63:13,23 64:3,5,23 65:2,6,21 66:6 67:7 69:3,9,11,16,17,20 70:3,6,8,11,17 72:7, 15 73:7 74:14 76:21 77:8,20,23 79:18,19 80:6,13

**called** 3:4 27:9,15

**calling** 62:19

**calm** 40:10

**cameras** 57:2

**care** 40:20 60:19 62:22 66:1,10 68:17 69:15,17 70:1,14

**carried** 48:5 49:3

**carry** 26:11 62:17

**case** 24:17 41:19 48:10

**cavities** 50:11

**cell** 13:12,16 14:4, 18 15:1 30:5 31:23 32:5,6,10,22 33:23 34:3,5,7 35:16,18, 24 37:3 38:24 39:1, 2 43:18 44:21 56:17,23 62:16 66:12,15,20 68:14 77:3 79:15

**cellmate** 40:1 50:6, 10

**cells** 33:21 76:3

**center** 5:14 6:20 8:20 12:12 23:20 56:24 61:17,19 62:6,8,12,13,15,19 63:1 69:16 78:24 79:1

**central** 67:10,13,19 68:3,6,13 69:6

**chance** 49:19 61:11

**changed** 21:22

**channel** 68:19

**channels** 68:17,20

**chaplain** 44:12 59:18 72:21

**characterization** 18:13

**check** 8:23 34:5 35:2

**checked** 58:16

**chemical** 18:11

**Chicago** 4:13

**circumstances** 7:24

**civil** 6:13,15

**claim** 8:6

**claims** 6:23 7:9,12 55:22

**class** 10:4,6

**classification** 79:2

**classify** 79:1

**classroom** 9:12, 15,23,24 10:7,9,13, 16 12:2,3,4

**clean** 39:2

**cleaning** 76:3

**cleanings** 38:24 39:2

**client** 38:1

**co-defendant** 55:18

**Code** 63:6,7,12,13, 14,18,23 64:3,6

**collect** 72:7

**collected** 24:22

**college** 5:1,3,4,5 6:6

**combination** 29:9

**commander** 20:11

**comment** 47:5,12

**commissary** 25:9 59:17 72:20

**committed** 7:21

**communicate** 20:15 30:20,23 44:3,6,7 67:10,13 68:7,14 69:6

**communicated** 29:23 31:11 41:5

**communicates** 58:1 69:3

**communicating** 13:4 36:13 40:6 41:4 67:19 68:3 69:21,22,23

**communication** 30:2 36:4,9 67:18 70:4

**communications** 15:16

**complain** 16:4

**complained** 16:2

**complaining** 50:3

**complaint** 16:12 51:6 58:11 64:18

**complete** 38:13

**completed** 4:24 11:15 41:11 49:11

**component** 12:2,3

**condition** 15:7 27:14 28:1

**conditions** 27:17

**confirm** 22:17

**considers** 80:15

**consist** 18:8

**consists** 18:10,14

**contact** 24:16,20 36:5,10,15 57:6,7,8, 10,11,13,23

**contained** 53:9

**continue** 37:8 38:22 39:7

**continued** 18:4

**continues** 65:7

**continuing** 18:3 39:15 76:19

**control** 12:9 13:12, 13 20:9 29:20 56:24 57:1,3,4,6 63:1 65:23 68:13,15,24 74:1

**conversation** 35:23

**convicted** 6:11

**copy** 19:16,17 81:18,20

**Corps** 5:24 6:2

**correct** 3:24 11:13 12:13 14:9 15:13,20 17:3 18:13 22:20 23:10,17,21 26:21 29:24 30:1 33:14 34:12 36:7,21 40:9, 11 48:22 51:20 52:15 53:3,10,11 54:14 57:16,20 64:8 65:14 66:11 67:1,23 68:5,12,15,19 73:5 77:12 78:1,4 79:20 81:7

**correction** 29:19 62:4 69:13 70:15 71:17 73:15,24 76:9 79:8

**correctional** 5:12, 14,16 6:20 8:20

ANDRE MILES

August 31, 2018
Index: corrections..experience

12:10,12 13:10 20:6
23:20 44:14 59:10,
15,16 60:9 64:10
66:4,7 78:20,21
79:14,17

**corrections** 5:15
8:10,11,14 9:2,20
11:10 12:16 20:4
23:8 28:21 46:16
71:21 72:1,2,7
77:16

**correctly** 81:9,16

**counsel** 16:19
18:21 19:1,5,17
30:17 45:11 56:14
58:11,12 63:8 67:6
82:6

**counselor** 79:3

**count** 32:3,6,7
63:15 78:22

**couple** 5:3 78:15

**courses** 5:1,3

**court** 3:15,21 17:20
19:17 45:15 81:5,16
82:1

**courtesy** 72:13,14
80:6,12

**CPR** 18:11

**crime** 6:11

**Criminal** 5:8

**crossed** 21:13

**current** 4:5,6 5:10

**curriculum** 5:6
9:16,18

**custody** 29:20 74:1

**cuts** 76:6

**cycle** 18:5,7,8,10

---

**D**

**daily** 20:6

**date** 4:3,4 22:14
23:23

**dated** 46:5 47:19

**dates** 18:22 19:12

**day** 10:1 14:22
20:18 21:22 22:15
43:13,21 48:1,11
59:22,24 73:19 76:3
79:10,11,14

**days** 52:8,10,13
55:1,11

**deal** 62:20

**December** 18:19,
23,24 19:18 21:5
23:9,20 24:3,6,8,13
51:19,20 52:5,6,9

**decision** 81:17

**decline** 36:15,20

**declined** 36:9

**declining** 42:24
44:3

**deem** 41:1,2,16
44:20

**deemed** 49:21
63:14

**deems** 40:24

**Defendant** 51:15

**defining** 37:16

**definition** 27:23
33:6 37:24 38:4,14,
16

**definitive** 22:12

**definitively** 25:18
26:1,18,22 36:14,18

**delay** 39:9 65:6

**delayed** 37:19
38:1,4,5,10,15,16

**Delta** 17:22

**Delta-edward**
24:10 31:22

**denies** 51:15 52:16

**dental** 79:4

**deny** 22:17 24:2,6,

12,15 47:9,15
48:20,22 51:21
52:23 53:4,8,12
54:19 55:3,4 65:11
78:6,9,12

**denying** 24:9 43:7,
24

**department** 5:15
8:10,14 9:1,20
11:10 20:3 23:7
36:17 44:23,24 45:2

**depend** 79:9

**Depending** 79:11

**depends** 10:11
62:11,18 68:9

**DEPONENT** 82:10

**deposition** 3:14
19:20 22:24 45:17
51:9 80:23 81:5

**depositions** 80:24

**describe** 12:19

**detail** 33:16

**determine** 40:4
42:7 63:2

**determines** 61:24

**devote** 76:10,12

**diagnose** 42:22

**dictate** 37:9,12
41:23 42:2

**difference** 27:20

**direct** 74:6

**discussing** 56:9

**disorientation**
33:4

**distribute** 57:9

**dizziness** 29:9
30:15

**dizzy** 33:1,22
34:11,15

**doctor's** 70:16

**document** 19:15,

19,24 20:2,5,21
22:22,23 23:4,6,12,
18 38:17 45:16,21,
23 51:7,8

**documents** 20:10
61:2,4

**dog** 16:10

**door** 40:1 63:17
66:16

**downstairs** 38:12,
13 39:3 60:16 74:8

**draft** 81:22

**dropped** 47:23
70:3,6

**duly** 3:1,4

**duties** 38:7,11,13
40:15 41:12 48:5
49:3,11 66:6 72:15,
16 74:15 78:19
79:13,16

**duty** 18:16 49:9
63:10 66:3 67:12
71:18 73:6 79:18,
21,24 80:7,15,18

---

**E**

**earlier** 51:18 54:1
80:11

**Edge** 4:6

**education** 4:23
18:3

**Edward** 17:23

**effect** 16:8

**effort** 30:22 69:5

**eight-hour** 76:10,
11

**emergencies** 40:2

**emergency** 13:2,9,
11,15 39:23,24
40:4,7,8,13,22,23,
24 41:1,2,6,9,17,18,
20,21,22,24 42:2,8
44:21 47:24 49:20,

21,22,23 50:2,4,7,9,
12,13,16,18 56:16,
20,22 58:2,5 61:14,
15,21 62:1,10,12,22
63:2,3,5,7,14,23
64:7,11,13,16 67:7
69:3,9,11,16,20
70:4

**employed** 5:19
8:23

**employer** 5:13

**employment** 5:10
24:24

**ensure** 79:21

**envelope** 14:4,5
15:19 38:3,17 60:15
61:10 74:8

**essentially** 80:22

**estimate** 6:22

**event** 54:12,19

**events** 51:19,21
52:5

**exact** 6:23 9:18

**EXAMINATION**
3:6 58:19 67:4
78:17 80:3

**examined** 3:5

**examining** 29:4

**excessive** 7:15,20
8:6

**excuse** 20:20

**exhibit** 19:16,20
21:12 22:22,24
24:5,12 33:9 45:14,
17 50:20 51:9 59:1
64:20 77:14

**exhibiting** 28:5,10
29:7 30:14,24 31:9
35:6 39:16 42:14
43:1

**expediency** 73:14

**experience** 37:18
42:11 46:15 60:8
64:9

ANDRE MILES

August 31, 2018

**experiences** 42:4

**explain** 56:19
66:12,15 80:21

**explanation** 28:4,
14

**express** 63:22 64:6

**expresses** 66:5

**eye** 50:15

---

**F**

**face** 52:22

**facilities** 8:15

**facility** 13:14
17:10,11

**facts** 46:24

**failing** 35:1

**fair** 71:20

**falling** 33:11,24
35:1 64:13

**familiar** 32:24 33:7
55:18,19,22

**feed** 16:10 75:3
76:1 79:9

**feeding** 38:8 74:17

**feel** 34:22 42:20

**feeling** 12:24 13:4
31:20 33:1,22
34:11,14,15 35:8

**feelings** 33:10
34:19 39:19

**feels** 49:16

**fell** 49:24

**fellow** 60:4

**female** 56:2

**females** 56:4

**field** 10:9

**figure** 72:24

**filed** 6:13,24 7:9
50:23

**finish** 76:16

**firearms** 10:12

**flip** 23:11 47:18

**floor** 36:1 64:2

**folder** 60:18 79:19

**follow** 12:15 13:24

**follow-ups** 78:16

**food** 15:22 16:3,7,
9,13 41:11

**foot** 34:17

**force** 7:14,15,20
8:4,7 18:15

**forgetting** 25:5

**forgot** 52:21

**form** 15:4 39:1 41:4

**forward** 61:22

**Foxtrot** 71:10

**frame** 18:18

**Friday** 10:1,3,4
11:17

**functioning** 58:2,6
68:11

**functions** 22:13

---

**G**

**gain** 33:4,24

**gallery** 76:2

**garbage** 16:10

**gave** 19:9 38:1
39:20 48:12 49:2
70:8,9 80:24

**general** 32:13,15

**generally** 7:12
60:9 65:19

**get all** 79:8

**give** 6:22 7:17,18
14:13,15 15:6 19:16
38:8 39:1 43:21,22
45:15 48:3 49:2

**giving** 63:8

**good** 3:8 51:4

**grade** 45:3 71:19

**graduated** 11:18

**grievance** 45:7,12,
24 46:1,5,7,9,21,24
47:6,10,13,19
48:16,18 58:22,24
59:2,6

**ground** 8:3 49:24
50:1

---

**H**

**hair** 76:6

**haircut** 25:9 75:24

**haircuts** 79:13

**half** 4:16

**hall** 39:21

**hand** 69:24

**handle** 14:8

**handouts** 10:19,
20,21

**hands** 44:22

**hanging** 54:3 65:3

**happen** 39:6

**Hardaman** 24:18
26:15,16,20 30:14
31:1,3 36:19 45:7
47:9,17 51:16 52:20
53:18 54:2,6 56:7,8
58:4,8 78:3

**Hardaman's** 50:24
58:24 59:6

**hate** 16:9

**head** 3:22 49:24
53:7

**headache** 29:9,14
30:15

54:7 70:9 72:17,19,
21,22 73:12,13,14,
15,16 74:5,6 81:5

**giving** 63:8

**headquarters**
13:13

**health** 18:14 40:20
69:24

**heard** 15:21,23
27:14,16,18,21 33:2
55:19

**Hey** 43:17

**high** 6:7,8

**highest** 4:23

**history** 5:10

**hives** 27:9,10,15,
16,17,18,19,20,22,
23 28:1 30:15
42:14,20 43:3

**hole** 66:18,23

**hollering** 40:3

**home** 10:4

**hospital** 33:16,17
74:7

**Hotel** 71:11

**hour** 48:11

**hours** 37:13 38:4
77:12

**house** 14:4 15:1
79:15

**hurt** 41:21,22 50:3,
13

**hypothetical**
41:14

**hypotheticals**
63:9

---

**I**

**ID's** 18:11

**idea** 40:17 48:19

**identification**
19:21 23:1 45:18
51:10

**IDOC** 8:21

**ill** 12:24 13:5 31:20
35:7,13 36:19
55:12,15

**Illinois** 4:7,13,20
5:14 8:10,14 9:1,19
11:9 20:3 23:7

**illness** 31:10,18,21
45:2

**illnesses** 32:9

**immediately** 11:19

**impression** 48:7

**inaccurate** 46:8,
12,24 48:16

**incarcerated** 16:5
70:13

**inches** 66:18

**incident** 25:2 31:8
36:13 45:8 56:6,8

**incidents** 7:24

**include** 12:11

**incomplete** 41:13

**incorrect** 53:2,14
54:13 57:14 78:13
81:24

**indicating** 14:7
21:15 22:4

**individual** 28:3
33:8 42:15 52:22
70:2

**individuals** 13:17

**inform** 14:8

**information** 13:20
29:16,17,24 30:3,4,
7,11 36:23 37:15
58:11 61:22 80:19

**informed** 16:15,19
30:18 37:6

**informs** 70:4

**infraction** 7:21

**ingrown** 34:18
41:20

**initiated** 36:8

ANDRE MILES

August 31, 2018
Index: initiates..messenger

**initiates** 36:3

**inmate** 8:2 12:17, 23 13:12,15,16 14:15 15:3,6,12 16:2 24:23 26:7,12 27:4,6 28:5,9,20 29:7,15 30:6,10,24 31:6,9,15,22 32:2,8, 11 33:23 34:3,11,21 35:1,6,18,20,24 36:3,8,13 37:2,6,10 38:20 39:2,16 40:12 41:1,8,16 42:13,22 43:1,14 44:6,7,14, 17,19,22 48:8 49:7, 15,23 50:3,5,8,10, 14 52:20 53:24 54:2,4 56:11,16,20, 22 57:2 58:1 59:10, 13,15 60:22 61:15, 20 62:6,9,13,14,16, 22 63:3,21 64:1 65:5,7,20 66:5 67:10,18 68:2,8 69:2 70:7 73:4,7,11, 22 75:23,24 77:7 79:22

**inmate's** 16:12 34:5,14,19 35:15 37:20 41:19 43:3,18 44:5 45:2 48:17 56:23 60:19 63:17 65:24 68:14,17 73:17 76:20

**inmates** 6:19 7:12 15:7,21 16:4 29:4 31:23 32:9,17,21 33:16,20,22 40:2 41:23 42:1,7,19 43:22 49:22 60:10 63:15 70:13 75:2, 11,14,19 76:11,12, 14,21 78:22 79:2,6, 10,12

**inmates'** 26:9 33:10 79:13

**inquire** 65:8

**inside** 14:5 15:24 26:8 31:23 32:3,21 34:2,3 54:8

**instance** 9:23 12:1 16:7 68:16,21 70:17 71:4 75:12 77:19

**instances** 73:1

**institution** 7:22 15:24 19:7 34:2

**instructed** 19:1 21:19 42:6 49:4

**instructions** 12:15

**insulin** 15:6 43:21

**intermediary** 68:22 73:22

**internal** 50:11

**interviewed** 58:23 59:1,3

**Investigation** 79:5

**Investigations** 75:5

**involved** 62:6

**involvement** 60:18 62:21 65:24 66:9

**involving** 56:7

**irrelevant** 69:23

**issue** 43:14 44:10 69:23

**items** 15:10

**ivy** 27:20

---

**J**

**January** 47:19

**job** 8:19 23:23 29:4, 20 34:9 37:11,13, 14,17 38:7,10,13 39:7 42:11 43:12 48:5 49:3 63:10 66:3,6 75:6 76:8 78:19

**jobs** 5:21 75:5 76:9

**Joliet** 4:7,19,20 5:5

**July** 46:5

**June** 4:9

**Junior** 5:5

**justice** 5:8

---

**K**

**key** 12:9

**kind** 46:3,4

**knee** 34:16

**knees** 34:22

**knowledge** 12:9 26:16 27:23 55:2,24 57:21 59:6

---

**L**

**lack** 54:11,18

**laid** 50:17

**Lane** 4:7

**lawsuit** 6:13 16:11

**laying** 35:24 36:1

**learn** 42:3

**learning** 42:11

**left** 66:17

**leg** 41:21

**legal** 76:7

**letting** 38:9

**level** 4:23

**lieutenant** 44:8,12 57:8 59:16

**light** 24:1,5,11 28:4

**light-headed** 34:15

**Lima** 71:11

**limbs** 50:6

**lines** 76:2 79:2,6

**list** 40:19 70:11,12 72:22

**litigation** 59:5

**live** 4:10

**lived** 4:19

**located** 56:23 60:16

**location** 12:8 25:8 48:5 49:3 53:6 54:9 61:23 78:23

**location0** 48:13

**locations** 25:11 79:7

**logs** 24:1 61:5

**long** 4:8,14,21 5:16 6:1 11:14

**longer** 37:6 68:18 77:10

**lying** 64:2

---

**M**

**M-I-L-E-S** 3:13

**made** 11:5 16:7 40:10

**main** 13:12 17:12 56:24 57:1,3,4,6 63:1 68:13,14

**maintenance** 70:19,20

**major** 20:12 44:12 59:16

**majority** 60:6

**make** 14:20 15:9 30:22 37:3 43:13, 17,18,19 47:12 53:15 55:5,6 59:20, 21,23 60:1,2 69:5 70:16 71:2 81:6

**makes** 14:21 36:24 73:18

**making** 16:3 34:1 37:2 75:21

**male** 56:1,2,3

**Management** 20:4

**Marine** 5:24 6:1

**mark** 19:15 22:21 45:14,15 50:20

**marked** 19:19 22:23 45:16 51:8 64:19 77:14

**material** 26:7 66:22

**materials** 10:16,24 11:3 14:17

**matter** 40:10 50:1

**Meadows** 4:6

**means** 67:19 68:2

**med** 39:21 59:22,24 60:5 73:18 74:6

**medical** 12:17 13:21 14:3,4,6,9,20, 21,24 15:5,7,8,12, 16 16:18 27:14 28:8 29:3,18,19 30:3,21, 23 31:5,11 36:4,6, 10,15,24 37:7,10,20 38:2 40:14,19,23,24 41:2,4,7,10,18,24 42:5,21,24 43:4,7, 11,12,15,16,23,24 44:1,3,6,9,13,17,18, 20 45:2,4 48:6,13 49:8,9,21 55:13 56:11 57:9 59:17, 19,22 60:7,11,15, 17,19,22 61:1 62:2, 20,22,24 63:1,2,7 65:24 66:10 68:3,7, 17 69:7 70:11,14 71:1,3,5,7,13,15,22 72:3,4,8,10 73:12, 16 74:2,4 75:8 77:2 79:4,22 80:1

**medical's** 44:24

**medication** 15:6 60:3

**meds** 75:6,22 76:6

**memory** 22:12 78:2

**messenger** 66:4 74:3

ANDRE MILES

August 31, 2018
Index: microphone..potentially

microphone 62:14

microphones 57:2

Miles 3:3,8,12,13
4:1 6:10 16:23 17:2
18:18 19:20,23
20:19 22:24 23:3,11
24:22 25:12 27:8
28:1 29:22 30:13,19
32:24 42:13 44:16
45:6,17,20 46:2
47:24 50:18 51:9,12
53:19 54:15 55:17
56:15 62:16 67:7
80:21

Miles' 54:3

military 5:22

mind 49:17

minimum 59:23
60:2

minute 46:2 48:11
51:2

minutes 37:12
38:3,23 39:3 77:11

mischaracterizes
27:2 35:11

misquoted 52:19,
22

Monday 10:1,3,4
11:18,20

morning 3:8,9
11:18

N

nail 34:18

nature 3:23

needed 21:17

neglected 65:20

neglecting 25:5

nod 3:22

non-emergency
63:5

nonresponsive

63:18

nonresponsivene
ss 63:19

nonverbal 63:9,11

notify 63:1

NRC 78:24

number 6:23

nurse 37:1 39:22
43:14 72:20,23
73:15,18 74:4,5
76:4 77:8,10

nurses 59:21 75:11

nurses' 75:6

O

O'DONNELL
21:11 22:2 25:20
26:5 27:1 28:22
29:11 31:12 32:12
35:10 37:21 39:17
41:13 42:16 43:5
46:13,17 47:2 48:23
49:12 51:5,23 53:15
55:7 58:14,20 61:13
67:2,14,21 68:23
73:8 76:16,22 78:7,
15,18 80:2,8,21
81:20 82:1,5,8

object 28:22 29:11
46:17 47:2 76:22

objection 25:20
26:5 27:1 31:12
35:10 37:21 39:17
41:13 42:16 43:5
46:13 48:23 49:12
58:14 61:12 67:14,
21 68:23 73:8 80:8

obligated 42:20

obligation 42:15

obtain 42:24 44:18
76:20

obtained 15:11

obtaining 68:17

occurrences
33:21

occurs 56:19

OCD 26:8

offender's 45:24

offenders 60:4

offer 15:3

offered 28:15
74:23

offering 15:15

offhand 11:1

office 16:17,20,22
55:18 56:4 60:16

officer 5:12,17 8:11
12:10,16 13:10
21:1,18,24 22:13
23:16 28:21 29:20
43:15 44:14 46:16
47:24 49:11 53:19
54:3,21 57:9 59:11
60:9 62:4,16,19
64:10 66:4,7 69:13
70:15 72:1,12
73:16,24 75:9 76:9
77:16 78:20,21
79:8,14,17

officers 20:6
71:17,21 72:2,7

open 49:24 66:17

operating 25:6,13
34:9

opportunity 38:18
50:22 54:8 74:12

option 81:10

orientation 9:1,7
11:21,23 12:1,6,14

originally 21:10

P

p.m. 10:5,7 14:24
21:4

Pages 47:18

paper 10:18,20,21
38:17

paperwork 14:5
19:6 44:20

paragraph 51:13
53:7,8,9 54:13,16,
20 64:21 65:11,16
77:15 78:3

part 13:18 22:4
80:22

partially 54:2 65:3

party 57:19,23

pass 13:20 14:3
15:5,9 25:8 29:15,
17,23 30:3,6,11
37:1,11,14 43:21
49:19 58:3 60:3
70:1 75:6 80:19

passed 36:22
78:11

passing 74:3 76:5

past 30:5 35:18,23
76:5

pay 45:3 71:19

peep 66:17

penal 7:21

people 55:12 74:18

perform 22:13
38:11

performed 38:14

performing 38:7
39:10

period 39:9

person 25:4 26:9,
12 27:5 54:5 70:10

personal 26:8
37:18

personally 16:20,
21 25:14 28:7

personnel 14:3,20,
21 15:5,8,16 29:4
31:5 41:5,10 44:4
49:9 59:17 60:7,11

61:1 70:9,11,21
71:3,5,7,14,22 72:4,
8,18 80:1

pertaining 47:11

physical 8:22 12:2
27:8 28:6 31:9,18

physically 10:14
32:5

physicals 25:9
74:19 75:4

pick 3:22

picking 76:5

pills 43:21

place 4:14 14:5
25:4 26:23 53:19
60:17,21

placing 25:2 44:8

plaintiff 24:17 27:5
38:7 39:1,24 47:23
52:18 55:12

play 56:16

pled 46:24 53:1,14
54:20 78:6

pocket 25:3,16
26:4,24 53:19,20,23
54:1,3 64:24 65:3

pockets 26:8

point 42:7 47:5
48:14 57:4

pointing 21:12

poison 27:20

policies 9:10,19
12:12

policy 13:22 14:8

position 5:11 8:11
11:19 20:15 22:6
76:20

positioned 23:19

positions 8:9

posture 34:5

potentially 57:12

ANDRE MILES

August 31, 2018
Index: present..shift

**present** 52:12,13 73:1

**press** 57:17

**presses** 56:20,22 61:15

**pressing** 61:20 62:10

**previous** 27:2 30:19 35:11 51:23 61:16 63:8

**previously** 31:4 63:4

**printed** 21:24

**prior** 4:10 5:19,21, 22 6:14 8:10 59:5

**privy** 13:10

**problem** 69:10,15, 16 70:22

**procedure** 12:15, 19 13:24 25:13 34:9 42:3

**procedures** 9:10, 19 25:6 32:4,7 39:10

**profusely** 50:11

**proper** 44:19 48:13

**properly** 81:8

**property** 26:9,12 27:4 53:24 54:4

**provide** 3:18 7:23 12:15 35:9 36:20 67:12

**psych** 74:18

**pushed** 13:15

**pushes** 57:21

**pushing** 57:22,23

**put** 26:7,9,10 27:4 38:2 48:4,12 52:21 53:5,24 54:4,8 60:15 70:10 74:7 79:18 81:8

**putting** 55:14

**Q**

**quarter** 20:24

**Quebec** 71:12

**question** 12:21 13:6,18 16:1 24:20 31:14 32:8 34:13 45:4 51:24 52:2 53:16 57:17 63:20 72:4 75:7 76:16 77:9

**questions** 3:18 58:21

**quick** 7:10 78:15 80:5

**R**

**raised** 28:2,18,20 29:8

**range** 9:10 10:12, 14 18:11

**raped** 50:10

**rash** 27:20 31:19

**reach** 41:6,10 62:7, 9,23

**reaction** 29:10 35:17

**read** 20:14,18 53:15 65:17 78:7

**reading** 8:22 58:10

**real** 7:10

**reask** 25:24

**reason** 6:11 34:6 35:22 36:5 47:15

**reasoning** 32:2 62:18

**recall** 8:5 9:18 16:6 18:18 22:10,11,15 24:16,19 26:14 52:5,14 53:11 54:6 55:2 58:8 59:3

**receive** 9:7 10:15

25:7 38:20 56:11 60:13 61:20 78:11 79:17

**received** 9:11 18:3 25:16 26:2,19 52:20,23 61:9 77:23 78:10,12 80:9,17

**receives** 12:16 79:22

**receiving** 26:14 44:17 51:15,22 52:17 53:4 77:20

**reception** 78:24 79:1

**recognize** 19:23 23:3 33:3 45:23

**recollection** 19:11 23:22 24:15 31:2 51:3,19 54:11,18 58:7

**record** 3:11 21:11 51:5

**records** 55:10

**red** 28:2,16,18,20 29:7

**refresh** 51:3

**regard** 59:1 61:6

**Reginald** 24:17

**regular** 9:21

**regulations** 9:10

**remember** 4:17 9:16 10:23 11:24 19:3,8 22:8 26:1 28:14 36:12 53:13 54:9 77:19 78:10

**repeat** 12:21 17:20 24:4 25:22

**rephrase** 69:2 72:5

**report** 14:10 20:17

**reported** 11:18

**reporter** 3:21 17:20 19:17 45:15 81:5,16 82:2

**reporting** 13:1

**reports** 12:23 14:1

**request** 12:16 14:2,13,16 15:3,4, 19 24:23 25:10 26:2,15,19 30:22 31:5 37:7,20 38:2, 20 40:16,18 48:8 49:10,18 51:16 52:17 65:6 70:3,6,8, 19 72:7,8 74:14 75:7 76:5 77:8,20, 24 80:7,17,18

**requesting** 40:23

**requests** 16:18 25:3,15 26:4,24 72:3,9,15 73:2,7 76:21 80:13

**required** 18:6

**reserve** 80:23 81:3, 4,12

**resided** 4:12

**residence** 4:15

**resources** 72:2

**response** 28:11,21 63:9,11,16

**responsibilities** 45:5 74:20 75:1,8

**responsibility** 37:14,17 41:24 42:5 44:5 72:11 73:18 77:2,5

**retained** 20:9

**retina** 50:15

**returning** 61:14

**review** 19:9 46:3,4 50:22

**ripped** 50:15

**role** 56:15,18 57:12, 15,19,20

**roll** 20:17

**roster** 19:18 20:4 23:8 24:5,10,14

**rosters** 19:7,9

**rough** 81:22

**rounds** 14:20,21 15:1,9 34:1 36:24 37:2 43:13,20 59:20,21,23 60:1 71:2 73:18 75:22

**route** 74:7

**rules** 9:9 12:11

**run** 75:2 76:1

**running** 22:16 38:9 41:11 60:6 74:16,17 76:6,7

**S**

**safe** 17:17 66:3 71:24 72:6 74:10 76:12

**SAITH** 82:10

**say-so** 46:10 48:17

**schedule** 9:21 43:20

**school** 6:7,8

**seconds** 37:4

**security** 29:5,20 43:15 74:1

**seizure** 35:16

**sending** 74:18

**sentence** 47:22 51:14 52:16 53:1,14 54:12 65:17

**sergeant** 44:8,12 57:8 59:16 69:13

**services** 36:6,10, 15 73:23

**serving** 41:11

**shake** 3:22

**shared** 58:12

**shift** 14:22,23,24 19:18 20:11,13,16 21:20 22:5,19 24:1,

ANDRE MILES

August 31, 2018
Index: shifts..system

5 55:13,14 59:21,23 60:1 76:10,11

**shifts** 59:22,24

**shop** 72:21 73:17

**shots** 15:7 43:21

**show** 40:2

**showered** 79:11

**showers** 38:9 41:11 74:16 75:3 76:2

**showing** 28:20 61:2

**showings** 21:3

**sick** 12:23 13:4 14:1,2,13,15,19 15:3,18,21 16:3,8, 13 24:22 25:3,7,8, 15 26:2,3,14,19,23 30:21 36:14 39:21 40:12,16,18,19 41:9 44:15 47:23 48:3,10 49:7,10,14,15,17,18 51:15,22 52:17 56:11 59:9,10,13 60:10,12,13 61:3,8 64:23 65:2,6,21 66:5,6 69:17,24 70:3,6,8,10 72:7,15 73:7 76:20 77:8,20, 23 79:17,18 80:6,13

**sickness** 16:17

**sign** 35:17

**signature** 81:3,4, 11

**significant** 74:11, 12

**significantly** 71:21 74:11 75:10

**signs** 35:6

**similarly** 23:3,18 24:11 53:14

**simply** 22:18 47:8

**single** 36:13

**sir** 3:9,12,16,20,24

4:2 6:5,9,12,17 7:5, 8 8:8,12,16 9:3,5, 14,17 10:22 11:1,4, 7,13,18 12:4,10,13, 18 13:1 14:11 15:14,17,20 16:1,4, 15,20 17:4,12,15,19 18:5,17 19:14 20:1, 8,22 21:2,6,15 22:7 23:5,10,13,17,21,24 24:14,19 25:1,6,17, 22 26:7,17 27:16,24 28:7 29:14 30:4,18 31:2,7,16 33:2,7,10, 15,18 34:23 35:5,19 36:7,11,16 39:14 42:9,12,18,21 43:11 45:3,11,13,22 46:6 47:20 49:15 50:19 51:1,4,17 52:7,8 53:3,6,18,20 54:14, 17,21 55:4,5 56:14 57:16 58:7,17 59:8, 12 60:20,23 61:7, 10,18 62:4,24 63:24 64:4,8,12,14,17,22 65:1,4,9,12,15,18, 22 66:2,8,11,21 67:1,8,16,23 71:19, 23 73:3 74:13,15 75:13,17 76:15 77:18,21 79:20

**situation** 40:7 48:2 62:11 63:5,6 64:3

**situations** 63:21

**skimmed** 51:1

**skin** 28:1,2

**slip** 14:2,13,16 15:3,18 24:22 25:3, 7,15 26:2,3,10,14, 19,24 30:21 38:2,8, 12,20 39:4,20 40:16,18 47:23 48:4,8,12 49:2,8,10, 18 51:16,22 52:17 54:7 59:10,14 60:13,14,18 61:9 64:23 65:2,6,21 66:6,7 70:3,6,9 72:15,20,21 73:7, 13,16 74:2,14 76:21

77:8,20,23 79:18,19 80:6,13,17

**slips** 14:19 25:10, 11 48:10 59:9 60:10 61:3 72:8 75:7 76:5 80:18

**small** 31:23 32:4 66:14

**solid** 66:22

**someone's** 70:23

**sound** 47:12

**South** 4:20

**speak** 47:16 52:8 57:3

**speaker** 57:3 68:10

**speaking** 7:12 54:6 58:8 65:20

**specific** 71:5 78:2

**specifically** 16:6 19:4 36:12 52:16 53:8 54:23 77:6,22

**speculate** 29:2

**speculation** 28:23 29:12 31:12 35:10 39:17 43:5 46:18 47:2 49:12 58:14 61:12 67:14,21 68:23 73:8 80:8

**speed** 16:14 18:20

**spell** 3:11

**spend** 9:22 75:10

**spent** 9:24 10:8

**spitting** 30:9 32:17,18

**spoken** 56:6

**Springfield** 11:9

**Sr** 3:3,12,13

**stabbed** 50:14

**staff** 8:2 13:21 14:6,9,24 28:8 29:18 30:3,21,23 31:11 36:24 37:10

40:14,20 41:2,7,18, 24 42:5,21 43:13, 15,16 44:1,6,9,20 45:4 49:21 57:9 59:17,19 62:2 68:7 69:7,12 71:1 75:8 77:2

**staff's** 72:10

**staffs** 71:13,16

**stand** 32:17 33:12, 24 34:17 35:2

**standard** 25:13 34:8

**stands** 78:6 80:14

**started** 21:21

**state** 3:10 25:6,7 26:18,23 49:16

**stated** 42:19 54:2 55:10 57:17 62:5

**statement** 30:20 55:5,6

**statements** 65:10

**states** 31:14

**Stateville** 5:14 6:20 8:16,17,20 11:16,22 12:3,6,12 15:12,22 16:24 17:3,6,18 18:2,23 19:12 20:6 23:20 24:8 32:12,15 33:20 42:2,4 71:18 78:24

**stating** 80:9 81:2

**stationed** 8:13 17:6,16,17 18:22 20:14 21:16

**stations** 33:20

**steel** 66:16

**stitches** 50:6

**stomach** 50:3,13

**stool** 32:22

**stop** 32:6 34:2,4 37:2,3 38:11,21 39:5 43:18

**straight** 33:12 40:20 44:9

**Street** 4:12

**strike** 16:24 17:16 27:13 41:7 72:4

**studied** 5:6

**stumble** 34:21

**stumbling** 33:11 35:1 64:11

**subdue** 8:3

**submit** 14:14 25:5 40:16 49:10 59:10, 13 60:10 61:10 63:12 66:7 72:2,15 73:2,6,11 74:12 77:8 80:6,12

**submits** 44:19

**submitted** 31:4 37:7 45:7 58:24 61:3,8 77:23

**submitting** 15:18 37:19 38:17 65:7,21 70:18 77:20

**substance** 7:11 10:23 46:3

**sued** 6:16,18 7:6

**summarize** 49:7

**supposed** 48:9 60:10 70:14

**sweat** 42:19

**sweating** 42:14 43:2

**sworn** 3:2,5

**symptom** 27:9 31:20 35:17

**symptoms** 27:10, 19,21,22 28:6,8,10, 13 30:15,24 31:10, 15,18 33:9 39:16,20 43:2 68:3

**system** 57:4 61:15, 16,21 62:23 67:7,9, 19 70:4,18

ANDRE MILES

August 31, 2018
Index: takes..yearly

**T**

**takes** 37:4

**Taking** 75:22

**talk** 69:14

**talked** 67:6

**talking** 31:22 35:20 54:9 63:4 69:8,12, 21

**taught** 9:9,16 12:5, 7,8 42:6,9

**teach** 12:22

**tech** 39:21 74:6

**technically** 57:20

**technicians** 59:23

**techs** 59:22,24 60:5 73:19

**teeth** 30:9 32:18

**telling** 34:8

**tells** 13:20 29:16

**ten** 38:3

**term** 27:16,18 33:1, 2

**terminology** 27:22

**terms** 62:21 65:7 66:10

**test** 8:22

**testified** 3:5 66:24

**testifying** 66:13

**testimony** 3:14,15 27:2 35:11 61:16 65:13 80:23 81:1

**textbook** 10:18

**theor** 45:5

**thing** 47:21 66:23

**things** 3:23 30:12

**three-part** 13:6

**three-quarters** 23:14

**throwing** 50:8

**time** 9:22,24 10:8, 16 13:7 16:23 17:6 18:18 22:11 37:4,9 38:8 43:20 46:4 60:2 71:18 74:11 75:10 76:19 77:7

**times** 14:22 60:1

**today** 65:13 80:23 81:3,8,11,15

**toe** 34:18

**toenail** 41:20

**toilet** 30:10,11 32:17,18,22

**told** 9:19 19:5,7 21:17,19 22:5,8 47:23

**tomorrow** 81:12

**tooth** 41:22

**torn** 50:11,15

**trained** 29:19

**training** 8:24 9:6, 11,12,15 10:10,12, 13 11:12,15,21,24 12:6,14 18:4,6,7,8, 10,12

**transportation** 17:13,14

**travels** 66:16

**treatment** 43:4,24

**true** 39:15 70:15 80:14

**trust** 82:1,3

**trustworthy** 82:4

**turn** 20:19 30:21 39:4,8 59:19

**turned** 39:8

**type** 8:5,24 9:6 11:21,24 18:3,11 80:18

**types** 9:11

**U**

**Uh-hum** 7:2

**unable** 33:12,23

**unconscious** 35:16,19,20

**undergo** 8:24 11:20

**understand** 3:17 25:12 37:16 77:5

**unifying** 72:24

**unit** 24:10 40:21 44:10 52:10 67:10, 13,20 68:4,6 69:6 71:4 74:4 75:1,9,23 77:10 78:22 79:9,15

**units** 12:8 15:1 17:3,5

**V**

**vague** 33:6

**verbal** 3:18 15:16 31:4 32:7 35:23 36:8 63:16

**verbalize** 35:4,8 36:22

**verbalizing** 70:21

**verbally** 13:19 14:9,10 30:20,22 31:10,21 39:20 40:6 63:22 64:6

**verify** 19:9

**versus** 63:5

**viewed** 20:5

**vigorously** 40:2

**violation** 43:3

**visit** 62:13,15,17 75:24

**visiting** 72:22

**visits** 62:13 74:17 76:7 79:9

**visual** 32:7 63:16

**volition** 30:7

**vomit** 29:15

**vomiting** 29:8 30:6,9,16 31:19 32:11,16,21 42:14 43:2 50:8 64:15

**W**

**waiting** 70:12

**waive** 80:23 81:1, 11,17 82:5,7

**walk** 15:2 35:18,23 77:3

**walked** 30:5 32:10

**walking** 35:15 76:4

**walks** 15:5

**ward** 74:18,19

**warrants** 70:18

**watched** 53:19

**water** 32:18

**ways** 14:8 44:13

**website** 8:21

**week** 10:14 79:10, 12

**weekends** 10:3

**weeks** 10:2 11:11, 17

**West** 4:12

**whatsoever** 56:1, 18 57:24

**Whiskey** 71:12

**wide** 49:24 66:18

**Williams** 16:17,20, 22 54:21 55:18,24 56:4,5

**window** 31:24 32:3,4 34:3 66:14

**wing** 17:18,20 18:23 19:12 21:1

**visual** 22:18 23:15,19,23 24:7,13 32:12 40:3 66:13 71:4 73:24 74:22 75:12

**wings** 17:3,5 21:4 24:3 33:19

**witnessed** 28:5 30:23 31:9,15 32:11 33:8,21 34:10

**WOOD** 3:7 17:21 18:1 19:15,22 21:14 22:3,21 23:2 25:23 26:13 27:7 29:6,21 31:17 32:14 35:14 40:5 42:23 43:9 45:19 46:14,22 47:7 49:5 50:20,21 51:11 52:3 53:21 55:16 58:18 61:12 67:3,5, 17 68:1 69:1 73:20 76:18 77:4 78:14 80:4,11,20 81:22

**work** 11:18 15:23 52:7 58:13 71:15

**worked** 17:9 58:17

**working** 6:20 21:3 24:2,7,13 36:17 69:4 70:5 76:3 79:14

**worse** 48:2

**writ** 21:22,24 22:13, 16

**writing** 47:13

**written** 10:15 13:21 46:11 47:9 48:21

**wrong** 40:17 46:21 48:18 54:5

**wrote** 22:1 46:9,10

**Y**

**yard** 38:9 74:16 75:2 76:2 79:12

**year** 4:16 18:6

**yearly** 18:7

ANDRE MILES

August 31, 2018
Index: years..zones

**years** 4:2,22 6:3,4
7:1 9:17 15:11 17:7
18:2 24:24 36:17
60:8 64:10 77:17

---

**Z**

---

**Zone** 71:6,7,9,10,
11

**zones** 71:6,8